JONG HEE PARK ET AL. v. UNITED
STATES LINES, INC. ET AL.

[No. 266, September Term, 1981.]

*Decided January 6, 1982.*

The cause was argued before MORTON, COUCH and MacDANIEL, JJ.

*Paul D. Bekman,* with whom were *Daniel S. Katz* and *Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A.* on the brief, for appellants.

*Donald A. Krach,* with whom were *Niles, Barton & Wilmer* on the brief, for appellee I.T.O. *John H. West, III,* with whom were *Kieron F. Quinn, M. Hamilton Whitman, Jr.* and *Ober, Grimes & Shriver* on the brief, for appellee United States Lines, Inc. *James R. Eyler* and *Miles & Stockbridge* on the brief for appellee Clark. *David W. Skeen* and *Constable, Alexander, Daneker & Skeen* on the brief for appellees Svendborg, Moller and Maersk.

MORTON, J., delivered the opinion of the Court.

This appeal presents for resolution a question of first impression in this State. We must decide whether a vessel berthed in port and a stevedoring concern employed to unload it have a duty to warn land-based longshoremen of bad weather which might render hazardous unloading operations, and to suspend unloading operations until such unsafe conditions no longer exist.

It appears that on March 21, 1976, two container ships, the S.S. American Legend and the S.S. Albert Maersk, were berthed or in the process of being berthed in adjacent slips at the Maryland Port Administration's (hereinafter M.P.A.) facility in Dundalk, Maryland, and were in the process of being or were about to be unloaded through the use of M.P.A.'s container handling cranes. At approximately 1:15 p.m. on that day two cranes assigned to the S.S. American Legend were blown off the pier and into the water by gusting high winds. Chang Lim Park and Earl Wayne Bridges, the two M.P.A. employees manning the cranes, were killed.

A second amended declaration was filed by the personal representatives of the estates of Park and Bridges by their surviving spouses; and for the benefit of their surviving children and for the State Accident Fund.

The named defendants were United States Lines, Inc., and United States Lines Company (hereinafter U. S. Lines), owners and/or agents for the owners of the S. S. American Legend (hereinafter American Legend) over which vessel the decedents were positioning their cranes when the accident occurred; I. T. O. Corporation of Baltimore (hereinafter I.T.O.), a stevedoring concern employed by U. S. Lines to unload cargo from the American Legend; A/S D/S Svendborg; D/S af A/S; Quivira Shipping Company Ltd.; Maersk Line Agency, Inc., owners and/or agents of the owners of the S. S. Albert Maersk (hereinafter Albert Maersk), the vessel berthed next to the American Legend at the time of the accident; Moller Steamship Company, Inc., which employed stevedores to unload the Albert Maersk; and John T. Clark and Son of Maryland, Inc. (hereinafter

Clark & Son), stevedores employed to unload the Albert Maersk.

The facts as finally alleged, after demands for particulars, are not complex. The declaration alleged, in pertinent part:

"On or about March 21, 1976, the SS ALBERT MAERSK was berthed at Berth 11 of the Dundalk Marine Terminal and the S. S. AMERICAN LEGEND was berthed at Berth 12 at the Dundalk Marine Terminal. The owners of the respective vessels, and/or the agents of the owners contracted with the Maryland Port Administration for use of the respective berths and the equipment and facilities appurtenant thereto for the unloading and loading of the vessels, including the rental and use of container handling cranes. Crane numbers 4621 and 4622 operated and manned by the Plaintiffs' Decedents, Chang Lim Park and Earl Wayne Bridges, were assigned to the S. S. AMERICAN LEGEND beginning at 12 noon on March 21, 1976. Crane numbers 4619 and 4620 were assigned to the SS ALBERT MAERSK beginning at 8:00 a.m. on March 21, 1976. At approximately 1:15 p.m. on March 21, 1976, while assigned to operate and man the cranes used for the loading/unloading operations for the respective vessels, crane numbers 4621 and 4622 were caused to fall off the pier and into the water adjacent to Berth #12 as a result of the fact that crane numbers 4619 and 4620 were caused to move from their positions where they were operating, causing crane number 4619 to strike the mast of the SS ALBERT MAERSK and crane number 4620 to strike the mast of the S. S. AMERICAN LEGEND and further resulting in crane 4619 and/or crane 4620 striking the crane in which Earl Bridges was the operator causing same to fall off the pier and into the water. As a result, the Plaintiffs' decedents, Chang Lim Park and Earl Wayne Bridges were killed.

That at the time of the happening of this occurrence, the decedents, Chang Lim Park and Earl Wayne Bridges were employed by the Maryland Port Administration as crane operators. . . . That the [owners and/or agents of the American Legend], through their agents, officers and servants, supervised and had control over the loading and unloading of cargo with respect to . . . the American Legend . . .; that [they] supervised and controlled the work being performed by Plaintiffs' decedents; that [they] knew, or by the exercise of reasonable care should have known of the dangerous wind and weather conditions in the vicinity of the Maryland Port Administration facilities at the time of the occurrence; that said Defendants, knowing of the weather conditions existing at the time, and knowing that such conditions presented a hazard and a danger to persons operating under their control and supervision, including the Plaintiffs' decedents, had the duty and responsibility to suspend the operations then and there being performed; that despite the aforesaid knowledge, the said Defendants continued to perform work and operations and failed to warn the Plaintiffs' decedents of the impending danger and failed to shut down or suspend the work and operations then being performed.

That it was the duty and responsibility of the Defendants individually, and jointly, to safely and properly perform loading and unloading operations at said location and to further suspend and/or terminate said work and/or operations if weather conditions were of such a character so as to endanger life or property including cranes 4621 and 4622, which were manned by the decedents and which were intimately involved in the work and operations then being performed, and to warn or otherwise notify the decedents, their supervisors and/or employer of the weather danger which they

knew or should have known was approaching, and to safely, properly and correctly monitor the weather conditions in the area of the occurrence where cranes 4621 and 4622 were being operated for the safety of their property and of the lives of all persons engaged in the performance of work in the vicinity of the cranes #4621 and 4622.

The deaths . . . were caused by the negligence of the Defendants . . . their agents, servants and employees in causing and permitting the Plaintiffs' decedents to man said cranes under the conditions then and there existing, and as a result of [their] negligence . . . in failing to shut down and/ or terminate loading and/or unloading operations . . . [and] in failing to warn the Plaintiffs' decedents of the dangerous conditions . . . [and] in failing to heed the warnings of dangerous weather conditions which were likely to exist . . . and [in failing] to restrict access to the cranes by all personnel until such time as it would be safe to man same; and . . . in causing and permitting the SS AMERICAN LEGEND and SS ALBERT MAERSK to be berthed and located in said locations under the then existing circumstances . . . ."

The declaration alleged the same control and duties on the part of: I.T.O. by virtue of the fact that it "was responsible for the loading and unloading of cargo on the American Legend"; the owners and agents of the Albert Maersk by virtue of the fact that they had similar "control over the loading and unloading of cargo with respect to the vessel S.S. Albert Maersk"; and Clark & Son by virtue of the fact that it "was responsible for the loading and unloading of cargo on the SS Albert Maersk."

By way of demurrer each defendant challenged the legal sufficiency of the claims, stating that the declaration as amended failed to allege a cognizable duty of care. The Superior Court of Baltimore City (BOTHE, J.), in finding the correlative rights and duties no more apparent in the second

amended declaration than the two which preceded it, concluded that the plaintiffs failed to state a cause of action and sustained the demurrers without leave to amend.

It is first to be noted that the trial judge in ruling on the demurrers had to assume the facts were as the plaintiffs alleged. Plaintiffs conceded at oral argument, however, that although the declaration indicated that the American Legend was already berthed and being unloaded at the time of the accident, in fact the vessel was just coming into port and the unloading operations had not yet begun.

As modified by this concession then, the facts are simply these: Park and Bridges were in the process of postitioning M.P.A.-owned, pier-based cranes over the American Legend, which cranes were then to be manned by employees of the stevedoring concern employed by the vessel to unload it, when the cranes were blown off the pier and into the water by gusting winds causing the deaths of Park and Bridges; and that no one in the employ of either the American Legend, the ship berthed at an adjoining berth, or the stevedoring companies employed to unload either vessel warned either Park, Bridges, or the M.P.A. of the dangerous weather conditions or suspended the hazardous unloading operations.

Assuming the facts to be true, the question for our consideration is whether they form the basis for a cause of action upon which relief may be granted.

## Jurisdiction of Admiralty

Before we can answer the question posed, we must address the threshold issue of whether or not the appellees' alleged negligence constitutes a maritime tort so as to require the application of maritime law.

Almost uniformly, the courts look to the *situs* of the injury in determining whether to invoke admiralty jurisdiction in matters of tort. *See Moore's, Federal Practice,* Vol. 7A, Admiralty, pp. 3501-3601. However, the Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 740, under which

the plaintiffs seek to invoke maritime jurisdiction, provides for admiralty jurisdiction in "all cases of damage or injury, to person or property caused *by a vessel* on navigable water, notwithstanding that such damage or injury be done or consummated on land." (Emphasis added.)

Although earlier decisions disagreed on whether the Extension of Admiralty Jurisdiction Act applied to damage not directly and physically produced on the land by a vessel, *see, e.g., Hovland v. Fearnley & Eger,* 110 F.Supp. 657, 658 (E.D.Pa. 1952), *Clinton v. Joshua Hendy Corp.,* 285 F.2d 199, 201-202 (9th Cir. 1960), *cert. denied,* 366 U.S. 932 (1960); the Supreme Court has interpreted the Act as extending jurisdiction to cases where an injury on land is caused by, among other things, the ship's crew. *Gutierrez v. Waterman S. S. Corp.,* 373 U.S. 206 (1963).

The Supreme Court stated in *Gutierrez,* at 209-210:

> "There is no distinction in admiralty between torts committed by the ship itself and by the ship's personnel while operating it, any more than there is between torts 'committed' by a corporation and by its employees. . . . [T]he case is within the maritime jurisdiction under 46 U.S.C. § 740 when, as here, it is alleged that the shipowner commits a tort while or before the ship is being unloaded, and the impact of which is felt ashore at a time and place not remote from the wrongful act." (Footnote omitted.)

In *Canadian Aviator, Ltd. v. U. S.,* 324 U.S. 215, 224 (1945), it was stated:

> "The use of the phrase 'caused by a ... vessel' constitutes an adoption by Congress of the customary legal terminology of the admiralty law which refers to the vessel as causing the harm although the actual cause is the negligence of the personnel [through their acts and omissions] in the operation of the ship."

Because the plaintiffs allege that the deaths were caused, at least in part, by the negligence of personnel of the

American Legend and the Albert Maersk, the action against the various owners and agents of the vessels is within the admiralty jurisdiction by virtue of the Extension of Admiralty Jurisdiction Act.

With regard to the claim for negligence against the stevedoring companies — I.T.O. and Clark & Son — the United States District Court of Maryland's decision in *Maryland Port Administration v. S. S. American Legend,* 453 F. Supp. 584 (1978), provides guidance. In that case which involved a claim for property damage brought by the M.P.A. for the very same incident that forms the basis of the instant action, Judge Harvey, for the Court, quoted the Fifth Circuit in *Gebhard v. S. S. Hawaiian Legislator,* 425 F.2d 1303, 1306-07 (9th Cir. 1970), at 588:

> "[T]he question is whether the Extension Act, in giving jurisdiction over claims for injury 'caused by a vessel,' is restricted to jurisdiction over suits against the person responsible for the vessel's torts or whether it extends to all claims arising out of a vessel-caused injury, regardless of the parties sought to be charged.
> We think the latter is the proper construction. The Act by its terms applies to 'all cases' where the injury is 'caused by a vessel on navigable water.' It imposes no other requirements. On its face, therefore, the Act seems to base jurisdiction not on the character of the parties, as in diversity, but on the nature of the facts giving rise to the cause. And in view of the savings in time and money — both to litigants and to the courts — that result from consolidation in one action of all claims arising out of a single injury, we see no reason why we should depart from the literal meaning of the Act."

We are satisfied that the tort action against the remaining appellees is also within the admiralty jurisdiction by virtue of the Admiralty Extension Act.

Article 28 of the United States Code, § 1333, reads: "The district courts shall have original jurisdiction, exclusive of

the courts of the States, of . . . any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." The "saving to suitors" clause has been interpreted to mean that maritime law can be applied in state court, *see Romero v. International Term. Co.,* 358 U.S. 354, 362-63 (1959), and where the action is brought in state court, maritime law must be applied. *See Carlisle Packing Co. v. Sandanger,* 259 U.S. 255, 259 (1922). Thus, although the plaintiffs have decided to proceed outside the admiralty of the United States District Courts, they take with them the features peculiar to admiralty law. *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 408-10 (1953), including the doctrine of comparative negligence.

## The Vessel Owners' Standard of Care
## Under Maritime Law

General maritime law, a judicially formulated common law of admiralty recognized as "self-evident" at the time of the adoption of the United States Constitution and adopted by the United States maritime courts,[1] has traditionally afforded longshoremen a cause of action against allegedly negligent shipowners for injuries caused by a vessel. *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625 (1959); *Atlantic Transport Co. v. Imbrovek,* 234 U.S. 52 (1914); *Sieracki v. Seas Shipping Co.,* 149 F.2d 98 (3rd Cir. 1945), *aff'd.* 328 U.S. 85 (1946). The early cases involved longshoremen injured while working on the vessel. *See, e.g., Leathers v. Blessing,* 105 U.S. 626 (1881). It is from this general maritime law, combined with applicable acts of Congress such as the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §2 901 *et seq.,* that the definition of maritime negligence is derived.

In 1927 Congress enacted the Longshoremen's and Harbor Worker's Compensation Act [2] which provided the injured

---

1. *See* discussion in Gilmore & Black, Admiralty (1st ed.) § 1-16 at 40-42.
2. Act of March 4, 1927, ch. 509, 44 Stat. 1424 (codified at 33 U.S.C. §§ 901-50 (1970).

longshoreman, or his estate, with the exclusive remedy against his employer, preserving meanwhile the right to bring an action against any third party who may have caused the injury.[3] Negligence had been the primary basis for such actions under the Act (except for the period between 1946 and 1972 when the basis of such recovery was "unseaworthiness"[4]) and is now the only basis for recovery under the Act.

Section 905 (b), as amended by the 1972 Amendments to the Act, provides:

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed

---

**3.** Section 933, so redesignated by the 1972 Amendments to the Act, provides:

"If on account of a disability or death for which compensation is payable under this chapter the person entitled to such compensation determines that some person other than the employer or a person or persons in his employ is liable in damages, he need not elect whether to receive such compensation or to recover damages against such third person."

**4.** For earlier negligence cases, see Anderson v. Lorentzen, 160 F. 2d 173 (2d Cir. 1947); Grillo v. Royal Norwegian Govt., 139 F.2d 237 (2d Cir. 1943). Between 1946 and 1972, however, longshoremen brought their actions on the basis of "unseaworthiness" of the vessel rather than negligence because fault did not have to be shown. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 90-94 (1946). The 1972 Amendments to the Longshoremen's Act made negligence the exclusive remedy of the longshoreman against the vessel owner, however, by providing that liability of the vessel in such third party actions "shall not be based upon the warranty of seaworthiness or a breach thereof . . . ."

by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."

We recognize that the Act and cases decided under it are not binding under the circumstances here in that the Act does not cover "a[n] officer or employee of the United States or any agency thereof or of any State or foreign governments or of any political subdivision thereof." We note, however, that the reason for this exception was the doctrine of sovereign immunity and, as such, should have no effect on such third party suits as here where appellants are attempting to recover damages, not from the state agency which employed the decedents, but rather from the allegedly negligent vessel owners and stevedoring companies. For this reason, we find the post amendment cases proceeding under § 905 persuasive authority for our purposes — defining negligence.

Although § 905 clearly preserves the injured longshoreman's third party action against the vessel for negligence, the Act itself does not specify the appropriate standard of care owned by the vessel owner to a longshoreman involved in the process of loading or unloading cargo. While the legislative history of the Act is replete with references to "land-based" standards,[5] the treaties differ as to what standard should be applied.[6]

---

5. The House Reports state that under the Act, "a vessel shall not be liable as a third party unless it is proven to have acted or have failed to act in a negligent manner such as would render a land-based third party in nonmaritime pursuits liable under similar circumstances." Report of the House Education and Labor Committee, H.H.Rep. No. 1441, 92d Cong., 2d Sess., reprinted in [1972] U.S. Code Cong. & Adm. News 4698, 4704.

6. *See* G. Gilmore and C. Black, The Law of Admiralty, pp. 453-455 (1975); 1A E. Jhirad, Benedict on Admiralty §§ 111 *et seq.* (7th ed. 1977).

Several circuits have decided in favor of land-based principles. The Courts of Appeals of the Second, Fourth, and Fifth Circuits [7] have defined negligence under § 905 (b) in terms of the Restatement (Second) of Torts.

In *Anuszewski v. Dynamic Mariners Corp. Panama,* 391 F.Supp. 1143 (D.Md. 1975), *aff'd.* 540 F.2d 757 (1976), *cert. denied,* 429 U.S. 1098 (1977), a longshoreman was injured when a beam which supported a hatch cover was dislodged during unloading operations and fell on him. The hatch cover was supported by four beams which were usually locked into place by a series of pins, but on this occasion they were not. The longshoreman knew that the pins were unfastened and informed his foreman to this effect. He was told to go back to work, that it would be corrected. The Fourth Circuit held for the defendant shipowner once it had found that the danger was open and obvious to the longshoreman and that the vessel owner could reasonably have anticipated that the longshoreman would protect himself by, among other things, fastening the beams.

The Court, viewing the longshoreman as an invitee of the vessel owner, found controlling the established principles of negligence tort law set out in §§ 343 and 343A of the Restatement (Second) of Torts. Under these sections of the Restatement, the landowner will be liable to his invitees for his failure to exercise reasonable care to protect them against a dangerous condition on the land if (1) the owner knows or should know of the condition, should know it involves an unreasonable risk of harm and expects that the invitee will not discover it, or (2) the owner expects that the danger, though known and obvious to the invitee, will not be protected against by the invitee or will cause harm despite such obviousness.[8]

---

**7.** *See* Napoli v. Hellenic Lines, 536 F.2d 505 (2d Cir. 1976); Anuszewski v. Dynamic Mariners Corp. Panama, 391 F.Supp. 1143 (D.Md. 1975), *aff'd,* 540 F.2d 757; Gay v. Ocean Transport & Trading, Ltd., 546 F.2d 1233 (5th Cir. 1977).

**8.** The first two sections of the Restatement, Title E on Special Liability of Possessors of Land to Invitees, read as follows:

Where, as in *Anuszewski,* the longshoreman might reasonably be expected to protect himself against the open and obvious danger, the vessel owner will be relieved of liability. *Accord, see Frasca v. Prudential-Grace Lines, Inc.,* 394 F. Supp. 1092 (D.Md. 1975). Where, however, the vessel owner could reasonably anticipate that the longshoreman will not protect himself against even an obvious danger, the vessel owner may still be at least partially liable in negligence, notwithstanding the control exercised by the longshoreman. *See Napoli v. Hellenic Lines,* 536 F.2d 505 (2d Cir. 1976).

Napoli was injured aboard a ship when he slipped from snow-covered plywood boards which had been placed, unsecured, over drums to be unloaded. The Second Circuit, following §§ 343 and 343A, stated that "[w]here dangers are unreasonable, their obviousness, standing alone, should not necessarily relieve a [vessel owner] of all responsibility for their presence." *Napoli,* at 508. The Court, giving illustrations, indicated that the vessel owner should anticipate, and would be liable for, harm despite its obviousness where a longshoreman could not fully appreciate the risk, such as when distracted, or where he could not "avoid the danger even though aware of it," such as when "his duties as an employee may require his unavoidable exposure to it." *Napoli,* at 508. In *Napoli,* at 509, it was said:

"§343. Dangerous Conditions Known to or Discoverable by Possessor

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) Knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

343A. Known or Obvious Dangers

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated."

"[T]here was evidence from which a jury might conclude that the ship should reasonably have anticipated that Napoli would not be able to avoid the danger despite its obviousness. The thrust of Napoli's testimony was that he had to stand on the plywood in order to carry out his duties of giving signals to the winchmen. Thus, it might be argued that if this was the only place for Napoli to work and carry out his job, the vessel might reasonably anticipate that he would use it despite its obvious danger, since the only alternatives would be to leave his job or face trouble for delaying the work. Should the jury be persuaded by this argument and find that the shipowner was negligent in not correcting the open and obvious danger but that the plaintiff was contributorily negligent, it would apply the doctrine of comparative negligence to reduce the shipowner's liability proportionately."

Several circuits have objected to the application of Restatement Sections 343 and 343A, adopting instead a broader "reasonable care under the circumstances" approach. These circuits note that the traditional doctrines of contributory negligence and assumption of risk might bar any recovery by the longshoremen despite the long standing admiralty concept of comparative negligence. *See Pope & Talbot, Inc. v. Hawn, supra,* 409. The Ninth Circuit used in *Santos v. Scindia Steam Navigation Co.,* 598 F.2d 480 (9th Cir. 1979), and the Supreme Court approved in *Scindia Steam Navigation Co. v. Santos,* 49 U.S.L.W. 4405 (1981), this standard of reasonable care:

"A vessel is subject to liability for injuries to longshoremen working on or near the vessel caused by conditions on the vessel if, but only if, the shipowner (a) knows of, or by the exercise of reasonable care would discover, the condition, and should realize that it involves an unreasonable risk of harm to such longshoreman, and (b) the shipowner fails to exercise reasonable care under the circum-

stances to protect the longshoreman against the danger."

Just as "the special characteristics of [admiralty law] preclude unthinking adherence to § 343A alone or to a literal reading thereof," *Lubrano v. Royal Netherlands S. S. Co.,* 572 F.2d 364, 372 (1978), so this Court shall let those sections of the Restatement cited us serve only as general guidelines to illustrate the standard of reasonable care under all the circumstances.

### *Duty Imposed on United States Lines by the Standard of Reasonable Care*

It must first be noted that because the defenses of assumption of risk and contributory negligence are not available in maritime actions, U. S. Lines cannot defend on the ground that Park and Bridges should have refused to continue working in the face of the obviously dangerous weather conditions. *See Scindia, supra,* at 4411. We are concerned only with whether the "reasonable care" standard imposed on U. S. Lines a duty to warn the land-based longshoremen of the danger involved and to suspend unloading operations.

Because the injury here did not occur on premises owned or possessed by the vessel, the liability of U. S. Lines, in appellants' view, is to be adjudged by the standards articulated with respect to duties owed by the employer or an independent contractor, the independent contractor in this case being the M.P.A. and its employer being the vessel.

As articulated in the Restatement (Second) of Torts, § 408, which applies to independent contractors:

> "Except as stated in §§ 410-429, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants."

In assessing liability under the Restatement exceptions, §§ 409-415, the exception most favorable to appellants' case is § 414, which reads:

"NEGLIGENCE IN EXERCISING CONTROL RETAINED BY EMPLOYER. One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

Comment a, cited to this Court by appellants, states:

"[An employer of an independent contractor] may retain only the power to direct the order in which the work shall be done, *or to forbid its being done in a manner likely to be dangerous to himself or others.* Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." (Emphasis added.)

Appellants, citing *Jamison v. Byers Co.,* 330 F.2d 657 (3rd Cir.) *cert. denied,* 379 U.S. 839 (1964), urge this Court to hold that the vessel owner's authority to stop the unloading procedure was a retention of control sufficient to subject it to liability under § 414 for the consequences of its failure to do so. In response, U. S. Lines cites *Hurst v. Triad Shipping Co.,* 554 F.2d 1237, 1251 (3rd Cir.) *cert. denied,* 434 U.S. 861 (1977), for the proposition that "the simple allegation that a shipowner had control over loading and unloading operations will not suffice to establish a duty to the employee of an independent contractor who is injured in the course of that work." The Court in *Hurst,* quoting Comment c to § 414, found that the ultimate power to terminate work was not the kind of control contemplated by § 414:

"In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work

> is done. It is not enough that he has merely a general right to order the work stopped or resumed .... There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."

To hold otherwise would be inconsistent with Congress' intention in enacting the Longshoremen's Act to hold the vessel liable only for its own negligence. We think, however, that the longshoremen in *Hurst* were asking for infinitely more protection under § 414 than the appellants here. Under *Hurst* and *Lubrano* as well, the injured longshoremen were urging the courts to hold that the vessel owners' general duty to stop operations could render them liable for any injury that occurred down the line once the longshoremen's operations had begun.

Under the facts of this case, however, appellants are not attempting to render U. S. Lines the guarantor of the safety of all workmen against any accident for whatever reason. They only seek to hold U. S. Lines responsible in tort for their initial failure to suspend the operations when they clearly should have done so. In such circumstances as these, "control" in terms of the power to terminate operations is very significant.

We only conclude, with regard to § 414 of the Restatement, that "while not irrelevant, [it] do[es] not furnish sure guidance." *Scindia Steam Navigation Co. v. Santos, supra,* at 4408-09.

In deciding here what "reasonable care under all the circumstances" required of U. S. Lines, we bear in mind several points. First, it must be remembered that the Longshoremen's Act is a remedial statute enacted to protect the longshoremen. As such, doubts should be resolved in favor of the longshoremen. *See Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, *rehearing denied,* 444 U.S. 889 (1979).

More importantly, each party should bear the cost of his own negligence. The concept of comparative negligence is adopted in admiralty law so that the courts may inquire into the reasonableness of each party's conduct under the circumstances. Thus, in addition to what appears to be the primary negligence of the M.P.A. in failing to suspend unloading operations when the weather conditions necessitated it, the vessel owner may also be partially responsible for his own failure to do so.

We cannot but conclude that U. S. Lines may be, in at least some part, liable for the consequences of its failure to call off unloading operations in the face of the perilous gusting winds. The burden on the vessel in calling for the suspension of the unloading operations was small relative to the probability and severity of harm in their continuation. This Court takes judicial notice of the fact that because a ship that is not moving is costing money, vessel owners are anxious to get their vessels into and out of port as expeditiously as possible. If they are not willing to deal with that cost, they must face responsibility for the human cost that results in their inaction.

The reasonableness standard, we think, imposes on a vessel coming into port the duty to call off unloading operations where such operations would be rendered hazardous by known or obvious weather conditions. That duty attaches at that point in time when the vessel owner reasonably believes preparations will begin on shore for the unloading of its own vessel. Whether U. S. Lines reasonably believed that port employees had begun such preparations is a factual question which can only be answered after a full trial on the merits of the claim.[9]

The question for our consideration — whether the allegations of the second amended complaint form the basis

---

**9.** Another issue to be answered at trial is whether the weather conditions were, in fact, obviously dangerous to unloading operations. Appellants' use of the words "sudden high wind" raises the question in our minds of whether there was a danger that could have been protected against as opposed to an unforeseeable act of God against which no one can have the duty to guard.

for a cause of action upon which relief may be granted —
must be answered affirmatively with regard to U. S. Lines.
In negligence actions, a declaration need only allege, with
certainty and definiteness, facts and circumstances suffi-
cient to set forth a *duty* owed by the defendant to the plain-
tiff, a *breach* of that duty, and injury *proximately resulting*
from that breach. *Bramble v. Thompson,* 264 Md. 518,
520-21 (1972); *Read Drug & Chemical Co. v. Colwell Constr.
Co.,* 250 Md. 406, 412 (1968).

When judged against these principles, it becomes clear
that the declaration at issue has stated a cause of action
against U. S. Lines. It sufficiently alleges a duty on the part
of U. S. Lines to suspend the unloading operations begun by
the M.P.A.'s employees, appellants' decedents. That appel-
lants used a conclusory term such as "control" in their decla-
ration will not defeat its sufficiency.

There is also sufficient allegation that U. S. Lines' failure
to suspend operations was the proximate cause of the deaths
of Park and Bridges. It is not necessary, as U. S. Lines sug-
gests, that appellants contend that U. S. Lines "pushed,
pulled or otherwise motivated the cranes." It is sufficient
that appellants allege that U. S. Lines owed a duty to sus-
pend operations in the face of the wind conditions and to
restrict access to the cranes; and that as a result of their
failing to do so, appellants' decedents, who were in the
cranes during the wind conditions, were blown off the pier
and into the water where they drowned.

For these reasons, we disagree with the trial court's
conclusion that appellants failed to state a cause of action in
negligence against U. S. Lines.

### *Duty Imposed on Remaining Appellees by the Reasonableness Standard*

With regard to the remaining appellees, however, we
conclude that the declaration is insufficient to state a cause
of action.

As the Court of Appeals has stated regarding the sufficiency of a declaration in negligence:

> "If the facts alleged in the declaration would lead reasonable men to unite in the conclusion that defendant has violated no duty owed the plaintiff, the court may declare as a matter of law that the declaration is insufficient to state a cause of action despite words therein which allege negligence, as a conclusion of the pleader." *W. B. Bradley, Inc. v. N. H. Yates,* 218 Md. 263, 268 (1958).

We would agree that there is no such duty imposed on the remaining appellees and we so hold as a matter of law.

There is no relationship of any type between the M.P.A. or its employees and I.T.O., the stevedoring company employed by U.S. Lines to unload the American Legend. The M.P.A. and I.T.O. are separate and distinct independent contractors with altogether separate and distinct jobs. The only relationship that exists between the two is that I.T.O. contracted to use the M.P.A. cranes in the fulfillment of its contractual obligation to unload the American Legend. There is no duty owed by I.T.O. to the M.P.A. or its employees under these circumstances.

The joining of the owners and agents of the Albert Maersk, the ship docked at the adjoining pier, Moller Steamship Company, Inc., the company employing stevedores to unload the vessel, and Clark & Son, the stevedores employed to unload the Albert Maersk, seems to be a dragnet effort to include any conceivable defendants. No facts were alleged by appellants which would in any way show an obligation of the owners or agents of the Albert Maersk, or the stevedoring

company employed to unload it. Their demurrers were properly sustained.

> *JUDGMENT AFFIRMED as to I.T.O. Corporation of Baltimore; Quivira Shipping Company, Ltd.; Moller Steamship Company, Inc.; A/S D/S Svendborg; D/S af 1912 A/S; Maersk Line Agency, Inc.; and John T. Clark and Son of Maryland, Inc.;*

> *JUDGMENT REVERSED as to United States Lines, Inc., and United States Lines Company; and remanded for trial;*

> *United States Lines, Inc., and United States Lines Company to pay one-half the costs; and appellant to pay one-half the costs.*