REPORTED
IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 1888

September Term, 2012

---

SAIL ZAMBEZI, LTD.

v.

MARYLAND STATE HIGHWAY
ADMINISTRATION

---

Eyler, Deborah S.,
Meredith,
Kenney, James A., III
 (Retired, Specially Assigned),

JJ.

---

Opinion by Kenney, J.

---

Filed: April 30, 2014

Sail Zambezi, Limited ("Sail Zambezi"), appellant, appeals the judgment entered against it in the Circuit Court for Anne Arundel County in favor of the Maryland State Highway Administration ("MSHA"), appellee. It presents two questions for our review:

> 1. Did the Circuit Court err as a matter of law in including [the Code of Federal Regulations ("C.F.R.")] 33 C.F.R. §[§] 117.19-21 in the jury instructions?

> 2. Did the Circuit Court err as a matter of law in holding that the spreadsheets documenting the repair bills for the Zambezi were not admissible?

For the reasons that follow, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Sail Zambezi's sole asset is the Zambezi, a 60' Oyster sailboat. On October 16, 2010, Paul Gordon ("Mr. Gordon"), the owner of Sail Zambezi, took the Zambezi out for a day of sailing along with his wife, a friend, and the Zambezi's full-time captain, Guy Kalron ("Captain Kalron"). Going out, the Zambezi traveled downstream through the Spa Creek bridge (sometimes referred to as the Eastport bridge), a drawbridge that crosses Spa Creek connecting Annapolis and Eastport. The drawbridge is controlled by a drawtender located on the west side of the bridge. After sailing for several hours, the Zambezi returned and waited near the Annapolis City Marina for the bridge to open. Sometime before 2:00 p.m. the drawtender, David Anderson ("Mr. Anderson"), received a call requesting that the bridge open. At approximately 2:00 p.m., Mr. Anderson opened the bridge, and boats heading downstream passed through first. The Zambezi, without signaling to the drawtender that it was going to pass through, began moving upstream toward the bridge. Another boat also heading upstream passed in front of the Zambezi and went through before the Zambezi. The

drawbridge began to close as the Zambezi was proceeding through the bridge opening. When Captain Kalron observed the bridge closing, he reversed the direction of the boat, but the bridge and boat collided. When Captain Kalron called Mr. Anderson immediately after the collision, Mr. Anderson said he never saw the Zambezi in the water or on his video screen in the bridge operating station.

On May 19, 2011, Sail Zambezi filed a complaint[1] in the circuit court alleging that MSHA was negligent in that it breached its duty of care to the Zambezi because the drawtender "failed to observe the Zambezi approaching the bridge" and that the "Zambezi was in plain view prior to the time the bridge went up and should have been in plain view of the video camera or mirror after the bridge went up." Sail Zambezi further claimed that MSHA failed to maintain properly working mirrors and cameras. This breach of duty and the drawtender's breach of duty resulted in the bridge striking the mast of the Zambezi and the hull of the Zambezi striking the side of the bridge. Sail Zambezi alleged that as a direct and proximate result of MSHA's negligence, it suffered $77,200.29 in damages.

In its answer, MSHA asserted Sail Zambezi's contributory negligence and assumption of the risk as affirmative defenses. On March 30, 2012, MSHA filed a third-party complaint against Captain Kalron alleging that any damage to the Zambezi was caused by his "acts or

---

[1]Mark McGonigle, the owner of the boat that pulled in front of the Zambezi before it went through the Spa Creek bridge, was added as a defendant on January 11, 2012. On October 5, 2012, Sail Zambezi and McGonigle stipulated to a dismissal of all claims against McGonigle with prejudice.

2

omission." MSHA alleged entitlement to indemnification by Captain Kalron for any sums it was obligated to pay Sail Zambezi.

On October 16, 2012 the trial court addressed certain issues pretrial including jury instructions regarding the general requirements for signaling a drawtender prior to going through an open bridge span. Sail Zambezi argued that the specific Spa Creek bridge regulation, 33 C.F.R. § 117.571, varied from the general requirement that each boat must signal because the regulation states that "the draw shall open on the hour and half-hour from 9:00 to 4:30 p.m.," the time frame during which the collision of the Zambezi and the bridge occurred. MSHA countered that the Spa Creek bridge regulation was not at variance with the general requirement that a boat must still signal the drawtender. The trial court, agreeing with MSHA, found that "the applicable law would require a signal of some sort, notwithstanding the hours of operation."

During the trial, Captain Kalron testified as to his understanding of the bridge signaling requirements. He "knew that on Sundays and Saturdays and public holidays, [the bridge] opens on the hour and a half hour for waiting boats." Noting a difference between winter and summer, he stated "that in the season between the beginning of May and the end of October[, the bridge] would open for boats who are waiting. . ." Captain Kalron also noted that the sign on the bridge had the drawtender's phone number, but not a radio channel on which to call him. On cross-examination, he testified that he was also familiar with the C.F.R. provisions that require each vessel to signal if more than one vessel is approaching

3

a bridge and that if a bridge is open, each vessel approaching will also signal. He acknowledged that there was nothing on the Spa Creek bridge sign indicating that no signal was required.

The drawtender testified that even though the sign says the bridge will open on the hour and the half hour, "it's in the manual that there has to be - - someone has to contact me - - . . . for me to open the bridge."

The trial court gave the following jury instruction regarding the regulation:

> The operator of each vessel requesting a drawbridge to open shall signal the draw tender and the draw tender shall acknowledge that signal. The signal shall be repeated until acknowledged in some manner by the draw tender before proceeding.
> When two or more vessels are approaching the same drawbridge at the same time or nearly the same time, whether from the same or opposite directions, each vessel shall signal independently for the opening of the draw and the draw tender shall reply in turn to the signal of each vessel.
> The draw tender need not reply to signals by vessels accumulated at the bridge for passage during a scheduled open period. When a vessel approaches a drawbridge with the draw in open position the vessel shall give the opening signal. If no acknowledgment is received within 30 seconds, the vessel may proceed with caution through the open draw.

During the trial, an issue involving the admissibility of testimony regarding the reasonableness of the cost of repairs arose. MSHA argued that, because the case had not been filed under §10-105 of the Courts and Judicial Proceedings Article ("C.J.P.")[2] of the

---

[2]Courts and Judicial Proceedings Article §10-105 states in relevant part:

Section applicable to civil actions in District Court or circuit court
(a) The provisions of this section apply to a civil action in:

(continued...)

4

Maryland Code, there was "still a requirement for proof of genuineness and authenticity and fairness and reasonableness of the goods and services. . . ." Sail Zambezi stated its intent to introduce the repair bills as a business record and provide testimony regarding the charge and its reasonableness, but had not gotten to that point in its case. The trial court noted:

> So I am trying to anticipate some things. All right. So I don't believe that the business records exception excludes the requirement that the bill is somehow authenticated or whatever. And you haven't even complied with the provisions of [C.J.P. §] 10-105, which would be applicable in a smaller claim, which is to give notice that you are going to introduce the bill.
>
> So I don't believe the bill is admissible either under [C.J.P. §] 10-105 or under the business records exception unless you can convince me why it

(...continued)

> (1) The District Court; or
> (2) A circuit court if the amount in controversy in the action in the circuit court does not exceed the amount specified in § 4-401 [($30,0000] of this article for that type of action.

> Paid bill admissible without testimony of provider of goods or services
> (b)(1)(i) Subject to the provisions of this section, a paid bill for goods or services is admissible without the testimony of the provider of the goods or services as evidence of the authenticity of the bill for goods or services provided and the fairness and reasonableness of the charges of the provider of the goods or services.

> * * *

> Notice of intention to introduce bill
> (c)(1) Subsection (b) of this section applies only if, at least 60 days before the beginning of the trial, the party who intends to introduce the bill:

>> (i) Serves notice of the party's intent to introduce the bill without the support of the testimony of the provider of the goods or services that were billed, a list that identifies each bill, and a copy of the bill on all other parties as provided under Maryland Rule 1-321[.]

5

would be admissible as a business record, if you can argue that point. Because you don't have anyone here to certify it is a business record.

Arguing that the bills were business records, Sail Zambezi indicated that it would get the bills, keep track of them, add them up, and pay them in their course of business. The trial court, however, found that the invoices did not qualify under the business record exception to the hearsay rule because they were not Sail Zambezi's records, but "something they received in the mail."

Captain Kalron testified that he was in charge of "every aspect of maintenance and management of any maintenance that was done" on the Zambezi, and that he took steps to ensure that the cost of the repairs were reasonable by getting "a couple of estimates" and "decid[ing] to go with the person who [he] felt was reliable, experienced and in some cases the cheapest." The trial court, however, did "not allow him to give his ultimate opinion as to reasonableness because that is something an expert would do" and Captain Kalron was not qualified as an expert. Captain Kalron did testify that he "ke[eps] track of all receipts . . . in my manner of just running and maintaining the boat, I keep records of any expenses, which I file numbered the receipt. I have a [spread]sheet that I label the description and the amount." The receipts and spreadsheet are then sent to Mr. Gordon. Sail Zambezi sought to admit Exhibit 52, a spreadsheet that related to the expenses involving the repairs for the rigging resulting from the collision with the bridge. MSHA objected to its admission on the basis that it was a "written list of the bills" and because it was prepared for trial, not a business record. Sail Zambezi countered that the document was a compilation that was

6

prepared in "real time" for Mr. Gordon as part of Captain Kalron's employment.

The parties voir dired Captain Kalron regarding the spreadsheet. Captain Kalron testified that he managed the payments, kept track of them, and reported them. He said that "any running costs that are small in amount, I will just mark down and send an email with a numbered [sic], just as we're looking at now. It's a spreadsheet with a number of invoices and the amounts and the totals." According to Captain Kalron, he first created the Exhibit 52 spreadsheet in November 2010 and compiled it over an eight to ten month period. He testified that "for any major project [he created] its own separate [spreadsheet]." Otherwise, he explained, it would be difficult to identify expenses related to the collision from unrelated expenses that he was also paying for the Zambezi. When the trial court asked him why he specifically created Exhibit 52 in the form of a separate document, Captain Kalron responded:

> [f]or the purpose of this case. To make sure that the amount of what was related to the incident will be transferred to either, I did not realize whether we're going to end up in court or anything, to know how much was spend [sic] in regards directly to the accident and not just the whole month that I'm here.

The trial court found that, because Captain Kalron "indicated [the spreadsheet] was prepared for trial from other source documents," Sail Zambezi "should be using the source documents."

The trial court permitted Sail Zambezi to mark Exhibit 52 "for identification and [use it] to refresh [Captain Kalron's] memory." Captain Kalron then testified that Sail Zambezi paid around $60,000 for repairs, including the riggers that worked on the mast and replaced

7

the parts, the crane, dockage at the yard, storage of the mast for a month, environmental fees, car rentals, hotel payments, daily fees for keeping the boat out of the water, and a dehumidifier to prevent mold.

The jury found both Sail Zambezi and MSHA negligent with Sail Zambezi being 85 percent at fault and MSHA 15 percent at fault, but that no dollar damages had been proven.[3] Sail Zambezi then filed a timely appeal to this Court.

## DISCUSSION

*Applicability of 33 C.F.R. §117.19-21*

On appeal, Sail Zambezi argues that the circuit court erred in including 33 C.F.R. 117.15,[4] 19,[5] and 21[6] in the jury instruction. It argues that 33 C.F.R. § 117 details "the

---

[3]Even though Sail Zambezi proceeded outside the United States District Courts, "the features peculiar to admiralty law, . . . including the doctrine of comparative negligence" apply. *Jong Hee Park v. U.S. Lines, Inc.*, 50 Md. App. 389, 398 (1982) (internal citations omitted).

[4]"The operator of each vessel requesting a drawbridge to open shall signal the drawtender and the drawtender shall acknowledge that signal. The signal shall be repeated until acknowledged in some manner by the drawtender before proceeding."

[5]     When two or more vessels are approaching the same drawbridge at the same time, or nearly the same time, whether from the same or opposite directions, each vessel shall signal independently for the opening of the draw and the drawtender shall reply in turn to the signal of each vessel. The drawtender need not reply to signals by vessels accumulated at the bridge for passage during a scheduled open period.

[6]"When a vessel approaches a drawbridge with the draw in the open position, the vessel shall give the opening signal. If no acknowledgment is received within 30 seconds, (continued...)

8

operating regulations for all drawbridges in the United States." "Subpart A of those regulations provides general requirements for drawbridge operation, and subpart B contains regulations specific to individual bridges." The regulations in subpart B

> are in addition to or vary from the general requirements in Subpart A. Specific sections in subpart B that vary from a general requirement in Subpart A **supersede the general requirement**. All other general requirements in Subpart A, that are not at variance, apply to the drawbridges and removable span bridges listed in Subpart B. ([E]mphasis added).

33 C.F.R. §117.1(c). Subpart A requires that vessel operators "signal the drawtender in order to request a drawbridge to open, or to proceed through an already opened bridge," while "Subpart B, as it relates [specifically] to the Spa Creek Bridge states: 'on Saturdays, Sundays, and holidays year-round, the draw shall open on the hour and half-hour for vessels waiting to pass.'" According to Sail Zambezi, "the Spa Creek regulation is at variance with the requirement in Subpart A that a vessel operator must signal the drawtender[,]" because "[t]he Spa Creek bridge has scheduled opening times, when the bridge 'shall open' for waiting boats[.]" Sail Zambezi also points out that the individual regulations for all other bridges in Maryland specifically state that the bridges "shall open on signal," and that the regulation governing Spa Creek bridge does not include the phrase "on signal." Therefore, Sail Zambezi concludes that "[i]t is clear from this distinction that the Spa Creek Bridge was intended to operate differently than other bridges in Maryland," and that "[i]f a signal was required for

_____

(...continued)
the vessel may proceed, with caution, through the open draw."

9

the Spa Creek bridge to open, the regulation would read 'shall open on signal' just as nearly every other bridge regulation does." It further points out that "[t]he signs on the bridge confirm the scheduled time for openings, and make no mention of any need to call the bridgetender prior to scheduled opening."

MSHA responds by arguing that Subpart A of the C.F.R. "require[s] all vessels to signal prior to passage through a drawbridge. Section 117.15 specifies that 'the operator of *each vessel* requesting a drawbridge to open *shall* signal the drawtender' (emphasis added)." Additionally, §117.19 ("each vessel *shall* signal independently for the opening of the draw) and §117.21 (when a vessel approaches a drawbridge with the draw in the open position, the vessel *shall* give the opening signal) both "use the mandatory language 'shall' in setting out the obligation of the vessel to signal the tender prior to passage through the bridge," and "[i]n Maryland, the 'use of the word 'shall' is ordinarily presumed to be mandatory.' *G&M Ross Enters. v. Board of License Comm'rs*, 111 Md. App. 540, 543 (1996)" (internal citation omitted). According to MSHA, the Subpart B provision relating to Spa Creek bridge only modifies or varies the Subpart A provision "that a drawbridge 'must open promptly and fully for the passage of vessels when a request or signal to open is given." Whereas generally "a drawbridge 'open[s] promptly' upon receiving a signal," the Spa Creek bridge will open only at set times, but "[t]here is nothing in the Spa Creek 'opening schedule' that the general rule for vessels to *signal* is suspended." (Emphasis in original).

Moreover, MSHA contends that

10

A signal is the means by which a drawtender is able to distinguish a vessel 'waiting to pass' from a vessel merely idling in the harbor. A signal allows the drawtender to know when the bridge needs to be opened. It assists in determining how long an opening is required. It also avoids the inconvenience to motorists and pedestrians looking to cross the bridge. . . . The danger of not signaling is evident from the collision which occurred in the instant case.

The testimony at the trial showed that the Zambezi was awaiting passage through the bridge in the vicinity of the Annapolis City Marina. Because the Zambezi never signaled prior to attempting passage through the bridge, the drawtender began to close the bridge when it appeared that all the boats in line passed through the bridge. If boats "have no obligation to signal prior to passage through the Spa Creek Bridge, [it] would create untold havoc to boaters and local residents."

"[T]he standard of review for jury instructions is that so long as the law is fairly covered by the jury instructions, reviewing courts should not disturb them." *Farley v. Allstate Ins. Co.*, 355 Md. 34, 46 (1999) (citing *Jacobson v. Julian*, 246 Md. 549, 561 (1967)). When "interpreting regulations, we 'generally employ the same rules applicable to the interpretation of statutes.'" *Ward v. Dep't of Public Safety & Correctional Servs.*, 339 Md. 343, 351 (1995) (quoting *Chesapeake v. Comptroller*, 331 Md. 428, 440 (1993)). We review questions of statutory or regulatory interpretation de novo. *See Salamon v. Progressive Classic Ins. Co.*, 379 Md. 301, 307 (2004).

The cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature. In ascertaining legislative intent, we first examine the plain language of the statute, and if the plain language of the statute is unambiguous and consistent with the statute's apparent purpose, we give effect to the statute as it is written. If a statute has more than one reasonable

11

interpretation, it is ambiguous. If the language of the statute is ambiguous, we resolve the ambiguity in light of the legislative intent, considering the legislative history, case law, and statutory purpose. We consider both the ordinary meaning of the language of the statute and how that language relates to the overall meaning, setting, and purpose of the act. We avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense. We construe a statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory.

*Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park,* 392 Md. 301, 316 (2006) (internal citations omitted).

The regulation at issue is divided into subpart A and subpart B. "Subpart A contains all the general operation requirements that apply to all drawbridges." 33 C.F.R. §117.1(b). While,

Subpart B contains specific requirements for operation of individual drawbridges. These requirements are in addition to or vary from the general requirements in Subpart A. Specific sections in subpart B that vary from a general requirement in Subpart A supersede the general requirement. All of the general requirements in Subpart A, that are not at variance, apply to the drawbridges and removable span bridges listed in Subpart B.

33 C.F.R. §117.1(c). General requirements in subpart A include that "[t]he operator of each vessel requesting a drawbridge to open shall signal the drawtender and the drawtender shall acknowledge that signal. The signal shall be repeated until acknowledged in some manner by the drawtender before proceeding." 33 C.F.R. §117.15(a)(1). Additionally,

[w]hen two or more vessels are approaching the same drawbridge at the same time, or nearly the same time, whether from the same or opposite directions, *each vessel* shall signal independently for the opening of the draw and the drawtender shall reply in turn to the signal of each vessel. The drawtender need not reply to signals by vessels accumulated at the bridge for passage during a scheduled open period.

12

33 C.F.R. §117.19. (Emphasis added). The relevant Subpart B regulation for the Spa Creek

bridge states:

> (a) From May 1 to October 31, Monday through Friday, except Federal and State holidays:
> (1) The draw shall remain closed from 7:30 a.m. to 9:00 a.m. and from 4:30 p.m. to 7:30 p.m., except the draw shall open at 6:00 p.m. and 7:00 p.m. for any vessels waiting to pass.
> (2) The draw shall open on the hour and the half-hour, from 9:00 a.m. to 4:30 p.m.
> (3) The draw shall open on the hour and half hour, from 7:30 p.m. to 7:30 a.m.
> (b) From November 1 to April 30, Monday through Friday, except Federal and State holidays:
> (1) The draw shall remain closed from 7:30 a.m. to 9:00 a.m. and from 4:30 p.m. to 6:00 p.m.
> (2) The draw shall open on signal from 9:00 a.m. to 4:30 p.m. and from 6:00 p.m. to 7:30 a.m.
> (c) *On Saturdays, Sundays, and holidays year-round, the draw shall open on the hour and half-hour for vessels waiting to pass. Except on July 4th of every year from 8:30 p.m. to 11 p.m., the draw need not open for vessels, and in the event of inclement weather, the alternate date is July 5th.*
> (d) The drawspan must always open on signal for public vessels of the United States.

33 C.F.R. §117.571. (Emphasis added).

The plain language of the regulation before us is neither ambiguous nor at variance

with the general requirement that all vessels must signal to the drawtender to open a

drawbridge or that, in the case of two or more vessels seeking passage through an open

bridge, that each vessel approaching the bridge must signal. Section 117.571 simply indicates

the times when the bridge will open— on Saturdays, Sundays, and holidays at the hour and

half-hour. Nothing in the language of the Spa Creek bridge regulation suggests an intent to

omit the general signaling requirement imposed on "each vessel" to "signal independently

13

for the opening of the draw."

Moreover, interpreting the regulation related to the Spa Creek bridge as eliminating the need to signal prior to passage through a bridge would not, in our view, be reasonable, logical, or consistent with common sense. As demonstrated by the collision now before us, failing to signal on a busy waterway can confuse a drawtender about whether a boat intends to pass through a bridge or is just moving close by and can lead to accidents. In addition, as noted by the parties in their briefs, the Spa Creek bridge is in a heavily trafficked area for motor vehicles and pedestrians. It would be unreasonable to interpret the regulation to mean that the bridge is required to open every half-hour even when no boat has signaled its intent to pass through. That could lead to many unnecessary openings and delays to the traffic crossing the bridge. Accordingly, the trial court's jury instructions accurately covered the applicable law, and we shall not disturb them.

*Admissibility of the Spreadsheet*

Sail Zambezi argues that the circuit court erred in holding that the records[7] of the repairs to the Zambezi were inadmissible because the spreadsheet is a business record and therefore an exception to the hearsay rule. According to Sail Zambezi, the spreadsheet meets the requirements of a business record because it "was made in real time as the Captain paid

---

[7]In its brief, Sail Zambezi switches between arguing that "the spreadsheet" and "the spreadsheets" were excluded in error. We interpret Sail Zambezi's argument to refer particularly to the exclusion of Exhibit 52 (spreadsheet of the mast/rigging repairs) because the parties voir dired Captain Kalron in regard to that spreadsheet. However, our analysis would apply to any other spreadsheets created the same way.

14

repair bills for the vessel[;] . . . the spreadsheet was made by the Captain of the Zambezi, who testified that he was responsible for paying all bills[;]" the captain "had significant knowledge about vessel repairs and maintenance and was entrusted by the corporation to contract for all maintenance and repairs[;]" and Captain Kalron "regularly prepared spreadsheets like the one offered for [Sail Zambezi's] owner." Sail Zambezi argues that the circuit court erred in excluding the document "without any finding of unreliability[,]" and that "[o]nce it has been established that a document is a business record, the burden shifts to the objecting party to prove the untrustworthiness of the document." *See Owens-Illinois, Inc. v. Armstrong*, 326 Md. 107, 112-113 (1992). It further asserts that "[t]he source invoices were produced during discovery, and there was no suggestion by [MSHA] that the spreadsheet had been falsified or altered in any way," and "[b]ecause there was no finding of unreliability, and because the spreadsheets were a business record, they should have been admitted." Sail Zambezi also contends that the spreadsheet was not prepared for trial based on Captain Kalron's testimony that he "did not realize whether we're going to end up in court or anything[.]" According to Sail Zambezi, "the spreadsheet was simply intended to maintain a record of repair expenses separate from monthly expenses," and "[f]ailure to admit the records had severely limited [Sail Zambezi's] ability to provide corroborating details to the jury."

MSHA responds that the circuit court correctly excluded Sail Zambezi's spreadsheet because it was "created for the purposes of litigation[,]" and, therefore, "not a 'business

15

record.'" And, even if the spreadsheet did qualify as a business record, it should still have been excluded because of the hearsay within the spreadsheet. Under Maryland Rule 5-805, when "one or more hearsay statements are contained within another hearsay statement, each must fall within an exception to the hearsay rule in order not to be excluded." According to MSHA, the spreadsheet contains "information taken from bills and invoices that were not in evidence" and were "from various service providers." The bills and invoices "are not business records of [Sail Zambezi], but rather are outside information of the service providers." MSHA further argues that, while under C.J.P. §10-105, a "paid bill for goods or services is admissible without the testimony of the provider of the goods or services as evidence of the authenticity of the bills[,]" Sail Zambezi did not offer the bills or invoices into evidence, and prior to trial "there were no stipulations between the parties regarding any of the documents in the case." The "bills and invoices purportedly incurred for repairs due to the collision with the bridge . . . were never admitted into evidence. . . [nor] were [they] formally offered into evidence by [Sail Zambezi]." Nor would Sail Zambezi's claim fall under the purview of C.J.P. §10-105 because Sail Zambezi did not enter any bills or invoices into evidence nor did it offer an expert at trial to testify that "expenses incurred by [Sail Zambezi] were fair, reasonable, or causally related to the subject incident." Thus, according to MSHA, this issue is not preserved for our review because it was not raised or decided before the trial court. *See* Maryland Rule 8-131(a).

During trial, however, while discussing C.J.P. §10-105, Sail Zambezi stated it was

16

going to introduce the repair bills "down the stream from where [they were]" in its case. The trial court noted that it wanted "to anticipate some things," so Sail Zambezi argued that the bills were "business records . . . kept in the ordinary course of business" because Sail Zambezi would get the bills, keep track of them, add them up, and pay them. It also noted that it would provide testimony as to the reasonableness of the charges. The trial court found that the bills were inadmissible under C.J.P. §10-105 and the business records exception. Based on the record, we are persuaded that the issue was adequately preserved for our review.

We "review rulings on the admissibility of evidence ordinarily on an abuse of discretion standard." *Bernadyn v. State*, 390 Md. 1, 7 (2005) (citing *Hopkins v. State*, 352 Md. 146, 158 (1998)). When, however, hearsay is involved, our review "is different. Hearsay, under our rules, *must* be excluded as evidence at trial, unless it falls within an exception to the hearsay rule excluding such evidence or is 'permitted by applicable constitutional provisions or statutes.'" *Id.* at 8 (quoting Md. Rule 5-802). In other words, there is "no discretion to admit hearsay in the absence of a provision providing for its admissibility." *Id.*

Under Maryland Rule 5-803(6) a business record is an exception to the hearsay rule. To qualify as a business record, the document must:

> (A) . . . [be] made at or near the time of the act, event, or condition, or the rendition of the diagnosis, (B) . . . [be] made by a person with knowledge or from information transmitted by a person with knowledge, (C) . . . [be] made and kept in the course of a regularly conducted business activity, and (D) the

17

regular practice of that business was to make and keep the memorandum, report, record, or data compilation. A record of this kind may be excluded if the source of information or the method or circumstances of the preparation of the record indicate that the information in the record lacks trustworthiness. In this paragraph, "business" includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Md. Rule 5-803(6). Business records must meet "the tests of necessity and circumstantial guaranty of trustworthiness," *Mattvidi Associates Ltd. v. NationsBank of Virginia, N.A.*, 100 Md. App. 71, 87 (1994) (internal quotation and citation omitted), and "[t]he business records exception does not embrace self-serving records, made in anticipation of litigation, which lack circumstantial guarantees of trustworthiness." *Hall v. University of Maryland Medical System Corp.* 398 Md. 67, 89 (2007) (citing Lynn McLain, *Maryland Rules of Evidence*, Rule 5–803(b)(6), § 4(q )(I), 237 (2d ed. 2002)). "Summaries or compilations of business records may similarly be admissible," *Schear v. Motel Management Corp. of America*, 61 Md. App. 670, 680 (1985) (citing *Smith v. Jones*, 236 Md. 305, 309 (1964)), "when a proper foundation has been laid by a qualified witness on the stand." *Smith v. Jones*, 236 Md. at 309-10 (internal citations omitted). "It is generally required that the documents to be summarized be made accessible to the opposing party and that notice be given of the proponent's intention to use such a summary." *Sergeant Co. v. Clifton Bldg. Corp.*, 47 Md. App. 307, 316 (1980) (citing Annot., 80 A.L.R.3d 405 (1977)).

Here, after voir dire, the trial court denied the admission of the spreadsheet based on the fact that it was prepared for litigation and not an original business record of Sail Zambezi.

18

Even if the spreadsheet qualified as a business record, we hold that the trial court did not abuse its discretion in denying the admission of the spreadsheet due to facts surrounding its creation and the untrustworthiness of the document. As Captain Kalron testified, he regularly prepares monthly spreadsheets of expenses, but he created Exhibit 52 as a separate spreadsheet for "the purposes of this case." "[T]he purpose for which the record was prepared and any possible motive to falsify including whether the record's use in prospective litigation was a motive for its preparation" is a factor "that can be utilized by a trial judge in determining whether a business record or a portion of a business record should be excluded for lack of trustworthiness." *Owens-Illinois, Inc. v. Armstrong*, 326 Md. 107, 115 (1992) (internal citations omitted). Additionally, although Sail Zambezi argued that it provided MSHA with the invoices during discovery, no evidence was presented that Sail Zambezi had provided MSHA with the source documents during discovery or the monthly spreadsheets from which Exhibit 52 was created. Therefore, MSHA had no opportunity to compare the spreadsheet with the source documents.

Furthermore, when information in a business record is not admissible, the compilation is not admissible. *See O'Donnell v. State*, 188 Md. 693, 698 (1947). "[U]nder the common law and the Maryland Rules, each level of hearsay must satisfy an exception to the rule." *Bernadyn v. State*, 390 Md. 1, 20 n. 6 (2005) (citing *Hadid v. Alexander*, 55 Md. App. 344, 350 (1983)). Here, the information in the spreadsheet was based on the invoices that the trial court found inadmissible because they were not business records of Sail Zambezi and did not

19

comply with the requirement of C.J.P. §10-105. Nor did MSHA stipulate to the admissibility of the invoices during discovery. Therefore, the information in the spreadsheet did not satisfy an exception to the hearsay rule.

In the absence of applicability and compliance with C.J.P. §10-105, Sail Zambezi would have needed the testimony of the provider of the invoice to admit it as a business record or expert testimony explaining the reasonableness of the expenses. *See Shpigel v. White*, 357 Md. 117, 129 (1999) ("'[A] live witness still will be needed if . . . the business record does not establish all the facts needed to be proved, such as that the . . . bills were 'reasonable and customary.'" (quoting L. Mclain, *Self-Authentication of Certified Copies of Business Records*, 24 U. BALT. L. REV. 27, 75 (1994))). Moreover, the lack of testimony regarding the reasonableness of the charges added to the untrustworthiness of the spreadsheet. We "presume that the trial judge knows the law and applies it properly." *Thornton v. State*, 397 Md. 704, 736 (2007). In sum, we are not persuaded of error or abuse of discretion in excluding the spreadsheet.

**JUDGMENT AFFIRMED; COSTS
TO BE PAID BY APPELLANT.**

20