604 A.2d 47

**OWENS–ILLINOIS, INC.**

v.

**Othello ARMSTRONG, et al.**

**No. 77, Sept. Term, 1991.**

Court of Appeals of Maryland.

April 7, 1992.

Harry S. Johnson (Patrick C. Smith, Gardner M. Duvall, Julia K. Evans, Whiteford, Taylor & Preston, on brief), Baltimore, Walter E. Dellinger, Durham, N.C., argued, for petitioner.

Edward F. Houff, Carolyn J. Moses, Church & Houff, P.A., Baltimore, for amicus curiae Center for Claims Resolution.

Shepard A. Hoffman (Harry Goldman, Jr., David M. Layton, Goldman & Skeen, P.A., on brief), Baltimore, for respondents.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

Kaylo is an asbestos-containing insulation that was manufactured and sold by petitioner, Owens–Illinois, Inc., from 1948 to 1958. In 1958, Owens–Illinois, Inc. conveyed the Kaylo product line to Owens–Corning Fiberglas. Kaylo was generally sold as 50–60 pound blocks which were separated into pieces with hammers or saws. The cutting,

fitting, and installation of Kaylo was alleged to have been extremely dusty work.

Respondent, Othello Armstrong, worked first as a laborer and later as a welder on engines and in boiler rooms of various ships being built or repaired at the Bethlehem Steel Corporation shipyards. Armstrong was employed at the shipyards from 1942 to 1963. While there, Armstrong claims he was exposed to thick clouds of asbestos-containing dust which was identified by a witness as Kaylo dust. There is no allegation that Armstrong was exposed to asbestos products after he left the shipyards in 1963.

Respondent, Forrest Wood, was a rigger at a Bethlehem Steel shipyard from 1941 to 1975. As a rigger, Wood assisted other workmen in the removal of equipment and materials from ships. His job included assisting pipe-coverers in the installation and removal of pipe-covering insulation. This work, like that performed by Armstrong, was alleged to have involved exposure to heavy clouds of Kaylo dust.

Armstrong and Wood, along with two other workers not directly involved in this appeal, filed suit in the Circuit Court for Baltimore City against Owens–Illinois and other companies that manufactured, installed, or supplied asbestos-containing insulation products. The plaintiffs' allegations were based on negligence and strict liability in tort. A jury returned verdicts for Armstrong and Wood against each defendant. The trial court, Judge Clifton J. Gordy, Jr., denied the defendants' motion for judgment notwithstanding the verdict.

Owens–Illinois and Eagle–Picher Industries, two of the defendants, appealed. The latter's appeal was stayed after it filed a Title 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of Ohio, thus making Owens–Illinois the sole defendant seeking review of the judgments. The Court of Special Appeals affirmed the awards. *Owens–Illinois v. Armstrong,* 87 Md.App. 699, 591 A.2d 544 (1991).

This Court granted Owens–Illinois' petition for certiorari. We shall address each issue raised by Owens–Illinois, amplifying when necessary the factual scenario presented above.

## BUSINESS RECORDS

In 1969, a Bethlehem Steel industrial health engineer was directed by a vice president to conduct an asbestos exposure study and prepare a report on the exposure of both Bethlehem and non-Bethlehem personnel to asbestos-containing dust at Bethlehem's facilities. The five-page report was offered into evidence by Owens–Illinois as a business record of Bethlehem Steel.

Owens–Illinois contends the Bethlehem study should have been admitted because it showed that, in three "bystander" dust counts taken around employees in the same jobs as Wood and Armstrong working in ship engine rooms where insulation was being installed, no measurable amount of asbestos fibers was detected. Although acknowledging that the report was prepared and maintained in the ordinary course of business, Armstrong and Wood objected to its admissibility. Judge Gordy ruled:

> "I don't have any problem with this [meeting the] business record exception. That does not automatically make an exhibit admissible. It gets over that hurdle, but it is significantly unreliable.... I am not satisfied that the conclusions or the results cited herein are reliable. It is not trustworthy...."

On appeal, Owens–Illinois contends that "once a document has been found to be a business record there is no additional trustworthiness or reliability test unless [in a criminal case] the 6th Amendment is implicated." We disagree with Owens–Illinois and hold that a trial judge has discretion to exclude a document that meets the technical requirements of a business record when the objecting party persuades the judge that the document lacks the degree of

reliability and trustworthiness that business records are ordinarily assumed to possess.[1]

In *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), tort actions were filed against a railroad for death and personal injuries arising out of a railroad accident at a grade crossing. Plaintiffs alleged that the railroad was negligent because the engineer failed to ring the bell, blow the whistle, and have a light burning at the front of the train when approaching the crossing. Two days after the accident, pursuant to railroad requirements, the engineer gave a signed statement to railroad officials and to a State Public Utilities Commission representative containing his version of the accident and denying any negligence. Before trial the engineer died. At trial, the engineer's statement was offered into evidence by the railroad as a business record. Plaintiffs' objection to the admissibility of the statement was sustained, and after a verdict for the plaintiffs, the railroad appealed. The United States Supreme Court ultimately granted certiorari and upheld the trial judge's decision not to admit the engineer's statement. Perhaps the best analysis of the *Palmer* decision is found in 2 *McCormick on Evidence,* § 288 at 272 (John W. Strong ed., 4th ed. 1992) (hereinafter, *McCormick* ), which provides:

"While *Palmer* has been subject to various interpretations, the most reasonable reading of it is that it did not create a blanket rule of exclusion for accident reports or similar records kept by businesses. Rather, it recognized a discretionary power in the trial court to exclude evidence which meets the letter of the business records exception, but which, under the circumstances, appears to lack the reliability business records are assumed ordinarily to have. The existence of a motive and opportunity to falsify the record, especially in the absence of any coun-

---

1. Armstrong and Wood also contended before the trial judge that the 1969 asbestos dust study was not relevant. The Court of Special Appeals saw no need to reach that issue, and it was not raised before this Court.

tervailing factors, is of principal concern. The Federal Rule incorporates this reading of *Palmer* by permitting admission if the report otherwise complies with the requirements of the rule, 'unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.' " (Footnotes omitted).

This Court has recognized that, in some instances, business records may be excluded if established to be unreliable or untrustworthy. In *Marine Bank v. Stirling*, 115 Md. 90, 102–03, 80 A. 736, 739–40 (1911), a bank ledger on which checks "found loose in the bank" were entered was found too uncertain or unreliable to be admissible. We stated:

"Such a claim would not ordinarily of itself affect the admissibility of an individual ledger, containing the accounts between depositors and the bank, but under such circumstances as are shown in this case there is too much indicating the uncertainty and unreliability of this ledger account to permit it to be used as evidence *per se....*"

115 Md. at 103, 80 A. at 740.

The federal rules of evidence pertaining to the hearsay exception for business records and public records exclude otherwise admissible records if the sources of information or other circumstances "indicate lack of trustworthiness." Federal Rules of Evidence 803(6) and 803(8).

In *Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 495 A.2d 348 (1985), this Court examined the public records hearsay exception and held that "factual findings" contained in public records are admissible unless the party opposing introduction of a public record proves the factual finding is unreliable. Judge McAuliffe, writing for the Court, indicated how such unreliability may be established. The reasoning is equally applicable to proving a business or public record is untrustworthy. The Court stated:

"We also make clear that even though the burden rests upon the party opposing the introduction of a public record to demonstrate the existence of negative factors sufficient to overcome the presumption of reliability, this

does not mean that additional evidence will be required in every case to meet that burden. Indicia of unreliability may be contained in the report itself, or may be disclosed by the evidence of the party offering the report."
303 Md. at 612, 495 A.2d at 364.

The factors that can be utilized by a trial judge in determining whether a business record or a portion of a business record should be excluded for lack of trustworthiness may include such factors as: 1) the purpose for which the record was prepared and any possible motive to falsify including whether the record's use in prospective litigation was a motive for its preparation, *see Rossi v. Mobil Oil Corp.*, 710 F.2d 821, 830 (Temp.Emer.Ct.App.1983), *Jefferson Garden Associates v. Greene*, 202 Conn. 128, 520 A.2d 173, 181 (1987); 2) how routine or non-routine the record is and how much reliance the business places on the record for business purposes, *Palmer v. Hoffman, supra;* and 3) where, as in the instant case, the record contains opinions and conclusions—how valid, speculative, or conjectural the opinions or conclusions are, as well as the need for interpretation or cross-examination to prevent misleading or confusing the trier of fact. *See 2 McCormick,* § 293 at 280–81.

Wood and Armstrong contend that the trial judge was correct in his determination that the disputed "business record" of the asbestos dust study was untrustworthy. The Court of Special Appeals aptly noted that the study was made at the request of one of Bethlehem's vice-presidents and "[o]n its face, the report appears to be a single or, at most irregular, request." 87 Md.App. at 712, 591 A.2d at 550. The industrial health engineer may have been reluctant to report that personnel, including non-Bethlehem personnel, were being exposed to potentially lethal levels of asbestos dust. Armstrong and Wood point to a number of additional reasons why the report lacks trustworthiness which we note might also go to its relevancy. Armstrong had left Bethlehem six years before the study, and Wood had started working in the shipyard twenty-eight years

before the date of the study. The report does not indicate what products were being used in 1969 when the asbestos dust counts were done and that this information would be important because manufacturers had reduced or eliminated the asbestos in their insulation by 1969. The report also does not indicate whether the working conditions and dust exposure of the employees in the 1969 study were similar in relevant aspects to the working conditions and dust exposure of Wood and Armstrong.

The Owens–Illinois product Kaylo was apparently not one of the insulating products in use during the 1969 asbestos dust study, since Owens–Illinois had stopped manufacturing Kaylo eleven years before the study, and we have no description of the asbestos content, if any, of the insulation products that were in use during that study. Further, the trial judge was concerned that the report lacked sufficient specificity as to the methodology used in conducting the study. For the reasons indicated, the trial judge did not err in concluding that the "business record" lacked trustworthiness, and if the 1969 dust study results were to be admitted, the personnel conducting the study would have to be called as witnesses to establish the study's validity.

Although we sustain the trial judge's ruling which excluded the "business record" in the instant case because it lacked trustworthiness, we hasten to add that, where a record qualifies as a business record, there is a presumption of trustworthiness, and the objecting party, especially in a civil case, bears a heavy burden in order to exclude an otherwise admissible business record as untrustworthy.

## PROXIMATE CAUSE

Owens–Illinois' next contention is that Armstrong did not prove proximate cause because he "failed to present any evidence that had a warning been given, it would have been heeded." That contention is based in part on the fact that Armstrong smoked cigarettes for forty years until he quit in the mid–1970's despite health warnings that were placed

on cigarette packages after January 1, 1966. Therefore, according to Owens–Illinois, the lack of a warning on its asbestos product was not the proximate cause of Armstrong's asbestosis because there is no evidence that he would have heeded that warning.

In analyzing this issue, we must keep in mind that we are being asked to declare as a matter of law that there was insufficient evidence to have submitted this aspect of the case to the jury. Under these circumstances, an appellate court must view the evidence in the light most favorable to the prevailing party below, resolving all conflicts in its favor. *Lehman v. Balto. Transit Co.*, 227 Md. 537, 540–41, 177 A.2d 855, 857 (1962). "A party is not entitled to judgment n.o.v. unless the facts and circumstances so considered are such as to permit of only one inference with regard to the issue presented." *Impala Platinum v. Impala Sales*, 283 Md. 296, 327, 389 A.2d 887, 905 (1978).

Causation is a necessary element of any strict liability action. *Phipps v. General Motors Corp.*, 278 Md. 337, 344, 363 A.2d 955, 958 (1976). In considering whether causation has been proven in a failure to warn strict liability action, the trier of fact is entitled to draw the reasonable inference that people are assumed to act for self-preservation absent proof to the contrary. *See Md. Central R.R. v. Neubeur*, 62 Md. 391, 402 (1884); *Nizer v. Phelps*, 252 Md. 185, 205, 249 A.2d 112, 123 (1969).

Owens–Illinois asserts that Armstrong's "testimony that he smoked for forty years is sufficient evidence to rebut a 'self-preservation' presumption." We disagree and hold that the issue of causation was properly submitted to the jury.

This issue was addressed in *Raney v. Owens–Illinois*, 897 F.2d 94 (2nd Cir.1990). There the U.S. Court of Appeals for the Second Circuit held:

"[A] prediction as to what a worker, alerted to the [asbestos] hazards, would have done is generally within the range of reasonable dispute that makes matters appropri-

ate for submission to a jury. Evidence that [decedent], who had begun smoking and perhaps had become addicted years before cigarette health warnings appeared, did not stop smoking after such warning ... is, at most, a circumstance for the trier to consider in deciding whether an asbestos warning would have been heeded. Such evidence does not preclude a finding in plaintiff's favor. As [the trial judge] noted, a jury could reasonably conclude that [decedent] would have adjusted his conduct more significantly to asbestos warnings than to cigarette warnings...."

897 F.2d at 96. *See also Skonberg v. Owens–Corning Fiberglas Corp.*, 215 Ill.App.3d 735, 159 Ill.Dec. 359, 363, 576 N.E.2d 28, 32 (1991).

The fact that Armstrong was a heavy smoker who ignored warnings placed on cigarette packages during the last decade of the forty-year period when he smoked is not enough evidence to find as a matter of law that he would have ignored warnings about the dangers of asbestos. We find that there was sufficient evidence for the jury to reasonably conclude Armstrong would have heeded a warning of health hazards from inhalation of asbestos-containing dust from Kaylo products and that Owens–Illinois' failure to warn was the proximate cause of Armstrong's asbestosis.

## SUBSTANTIAL FACTOR

Wood testified that while assisting workers installing Kaylo pipe-covering, large amounts of dust "would fly like snowflakes" in the air around them. Armstrong testified that he was exposed to dust from pipe-covering material at the shipyard. One of Armstrong's fellow employees who worked with him for years testified that Armstrong labored near pipe-coverers using Kaylo, which created clouds of dust that completely coated the workers. Expert witnesses testified that the occupational exposure to asbestos was a substantial factor in causing Wood's and Armstrong's asbestosis. The trial judge instructed the jury:

"In order for a plaintiff to recover against a particular defendant, certain things must be shown—must be proved by the plaintiffs by a preponderance of the evidence. You must determine whether each plaintiff has proven by a preponderance of the evidence that he has asbestosis, he worked in proximity to and inhaled respirable asbestos fibers from the products of a particular defendant. It must be shown that a product or products manufactured or supplied by that defendant, by a particular defendant was a substantial factor in causing the asbestosis.

If no product manufactured or supplied by a particular defendant was a substantial factor in causing the asbestosis, then that defendant has no responsibility, and the defendant is out right away.

Unless there is a product that was manufactured or supplied by a particular defendant which was a substantial factor in causing the asbestosis, there is no responsibility on the part of that defendant."

Owens–Illinois contends that the instruction was deficient because it failed to adequately address the special legal meaning of "substantial factor." The company insists that the jury should have been instructed that, in order for its product to be a substantial factor in causing asbestosis, plaintiffs must show that each of them worked in proximity to Kaylo with enough frequency and with enough regularity for the inhaled fibers from Kaylo to have substantially contributed to their asbestosis. We need not decide whether the requested instruction was correct, since the matter was fairly covered by the instruction actually given.

We believe that in the instant case "substantial factor" was not a mysterious phrase requiring elucidation. The phrase has even been considered as one that is "sufficiently intelligible to furnish an adequate guide in instructions to the jury, and that it is neither possible nor desirable to reduce it to any lower terms." *See* W. Page Keeton, *Prosser and Keeton on Torts*, § 41 at 267 (5th ed. 1984) and authorities cited therein. The plaintiffs' expert wit-

nesses obviously understood the phrase "substantial factor" and, no doubt, so did the jury.

In the instant case, especially in light of the expert testimony and the nature and extent of Wood's and Armstrong's exposure to Kaylo, the judge was not obligated to further define the concept of substantial factor. "The court need not grant a requested instruction if the matter is fairly covered by instructions actually given." Maryland Rule 2–520(c).

## CAP ON NONECONOMIC DAMAGES

Next Owens–Illinois argues that the Court of Special Appeals erred in holding that Armstrong's damage award[2] was not subject to reduction by the cap on noneconomic damages in Maryland Code (1974, 1989 Repl.Vol.), Courts & Judicial Proceedings Article § 11–108 (hereinafter the CAP statute). Section 11–108 provides in relevant part:

"(b) *Limitation of $350,000 established.*—In any action for damages for personal injury in which the cause of action *arises* on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000." (Emphasis added.)

Owens–Illinois contends that Armstrong's cause of action "arose" in September of 1987 when he was first diagnosed as having asbestosis and, therefore, his award for noneconomic damages is subject to the CAP statute. Owens–Illinois argues that the cause of action "arises" at the time the claimant, with due diligence, discovers his injury. Its argument is an extension of this Court's interpretation of the word "accrues" in the statute of limitations context.

In an asbestos-related injury case, this Court held that "in situations involving the latent development of disease, a plaintiff's cause of action *accrues* when he ascertains, or through the exercise of reasonable care and diligence should have ascertained, the nature and cause of his inju-

---

2. Owens–Illinois challenges only Armstrong's damage award.

ry." *Harig v. Johns–Manville Products*, 284 Md. 70, 83, 394 A.2d 299, 306 (1978) (emphasis added).[3] In reaching this conclusion in *Harig,* the Court compared an asbestos related injury to a medical malpractice injury and reasoned that "a person incurring disease years after exposure cannot have known of the existence of the tort until some injury manifests itself. In neither case can the tort victim be charged with slumbering on his rights, for there was *no notice* of *the existence of a cause of action." Id.* at 80, 394 A.2d at 305 (emphasis added). Thus the Court recognized a distinction between the time that a cause of action comes into existence and the time that a cause of action may reasonably be discovered.

Owens–Illinois asks this Court to hold that a cause of action "arises" when it is discovered as opposed to when it comes into existence. In construing the CAP statute, "we assume that the words of the statute are intended to have their natural, ordinary and generally understood meaning in the absence of evidence to the contrary." *Brodsky v. Brodsky,* 319 Md. 92, 98, 570 A.2d 1235, 1237 (1990). According to Webster's New World Dictionary (2d ed.) the word "arise" means "to come into being; originate." Giving the word its ordinary meaning, we believe that a cause of action *arises* when it first comes into existence.

We agree with the Court of Special Appeals' conclusion that a cause of action in negligence or strict liability arises "when facts exist to support each element." *Armstrong,* 87 Md.App. at 724–25, 591 A.2d at 556. In a negligence claim, the fact of injury would seemingly be the last element to come into existence. The breach, duty, and causation elements naturally precede the fact of injury. Likewise in a strict liability claim, the existence of the

---

**3.** The principle that the statute of limitations is tolled until a plaintiff has either express or implied knowledge of the wrong is referred to as the "discovery rule." In *Poffenberger v. Risser,* 290 Md. 631, 637, 431 A.2d 677, 681 (1981), this Court held that the discovery rule was applicable to civil actions generally.

defective product and the causal connection will precede the resultant injury. Therefore, Armstrong's noneconomic damages should be reduced under Section 11–108 of the Courts & Judicial Proceedings Article only if his "injury" came into existence on or after July 1, 1986.

Unfortunately, identifying the time at which an asbestos-related injury came into existence is usually not a simple task. Due to the latent nature of asbestos-related disease, experts and courts alike have had difficulty in pinpointing its onset. In *Mitchell v. Maryland Casualty*, 324 Md. 44, 595 A.2d 469 (1991), this Court addressed argument over when "bodily injury" due to asbestos exposure "occurred" for the purpose of triggering coverage under a standard form insurance policy.[4] The Court considered expert testimony on behalf of both parties: Dr. Epstein, a clinician, and Dr. Craighead, a pathologist. It is no great surprise that the clinician testified that "bodily injury" did not occur until asbestosis had manifested itself or was clinically detectable. He explained:

> "Asbestosis is a disease that occurs in lung tissue as a result of prior asbestos exposure. Although asbestos fibers may be deposited in lung tissue in the course of various occupational exposures, ... the disease of asbestosis occurs only when there has been functional impairment of the lung. The human body has extremely effective defense mechanisms to protect the individual from suffering functional impairment as a result of inhalation of asbestos fibers (or other aerosolized materials). It is only when these defensive responses have produced enough alteration in the structure or physiology of the lung to lead to clinically detectable or symptomatic changes that disease can be said to be present."

---

**4.** The insurance policy in *Mitchell v. Maryland Casualty*, 324 Md. 44, 595 A.2d 469 (1991) specifically employed the terms "bodily injury" and "occurrence" in defining the scope of the policy's coverage. For technical accuracy, we retain use of those terms here.

*Mitchell,* 324 Md. at 66–67, 595 A.2d at 480. Thus, the insurance company argued that "bodily injury" occurred only upon the manifestation of disease. Conversely, the pathologist testified that bodily injury occurred much earlier:

> "As a pathologist I define an 'injury' to be the alteration of structure and/or function of a cell, tissue or organ. An 'injury' also would include physical or chemical damage to the body which may be detectable only on a microscopic or subclinical level. As a pathologist I define 'disease' as the process of reaction and/or repair to injury. In the discussion which follows of the diseases of asbestosis, bronchogenic carcinoma, and mesothelioma, there are injuries to cells, tissues and/or organs and associated diseases caused by exposure to asbestos fibers as described, notwithstanding the fact that the injuries and diseases may not be noticeable to a harmed individual or diagnosable by a clinician until some later point in time."

*Mitchell,* 324 Md. at 64, 595 A.2d at 479. Chief Judge Murphy, writing for the Court, noted that despite the physicians' disagreement as to the time when a change in the lungs may be classified as disease "there was no disagreement that the inhalation and retention of asbestos fibers may cause immediate harm to the cells and tissues of the lung." *Mitchell,* 324 Md. at 61, 595 A.2d at 477.

Fortunately, we have the benefit of hindsight in determining whether Armstrong's cause of action existed prior to 1986. We now know that in 1987 Armstrong was diagnosed as having asbestosis, and we agree with the Court of Special Appeals' conclusion that "[i]t is inconceivable that Armstrong's asbestosis came into existence between July 1, 1986 and his medical examination in May 1987." *Armstrong,* 87 Md.App. at 727, 591 A.2d at 557. We need not decide exactly when Armstrong contracted asbestosis. Given that Armstrong was exposed to large amounts of asbes-

tos from 1943 to 1963, his asbestosis probably had its genesis relatively early in the course of his exposure.

Owens–Illinois' expert testified that

"asbestosis does not develop immediately after exposure. It takes many, many years, and usually the kind of latency period that we are talking about is probably at the minimum 15 years but more ordinarily 20 or more years. During unusual circumstances less than that could cause the disease." [5]

Based on Owens–Illinois' expert's testimony, it is reasonable to assume that Armstrong's asbestosis took approximately twenty years to develop. Since his exposure began in the early 1940's, the most reasonable conclusion is that his asbestosis developed at least by the mid–1960's. Even assuming that the initial damage to Armstrong occurred in 1963, the last year in which he worked in the shipyards, the disease "ordinarily" would have developed by 1983 and under "unusual" circumstances even earlier. The only reasonable conclusion, even viewed in the light most favorable to Owens–Illinois, is that Armstrong had asbestosis prior to July 1, 1986. Consequently, we affirm the Court of Special Appeals' holding that Armstrong's damage award is not controlled by the cap on noneconomic damages.

## DAMAGE SETOFF

In the Armstrong case, the jury returned a compensatory damage verdict against Owens–Illinois, together with defendants Owens–Corning Fiberglas and Eagle–Picher, in the amount of $730,000. In the Wood case, the jury returned a compensatory damage verdict against Owens–Illinois and Owens–Corning Fiberglas in the amount of $657,000. The jury in both cases also determined that Owens–Illinois and Owens–Corning Fiberglas were liable for punitive damages.

---

5. Armstrong's expert defined the latency period, as well as the disease, somewhat differently. She testified that asbestosis is active and present from the time that the first fiber gets into the lungs but that often symptoms may not develop for twenty to thirty years.

The punitive damage phase of the trial was to commence the following day.

Subsequent to the verdicts, but before the punitive damage phase, Armstrong and Wood reached a settlement with Owens–Corning Fiberglas. Under the terms of the settlement, Owens–Corning Fiberglas would pay its full *pro rata* share of each compensatory damage award (one-third of the award in the Armstrong case and one-half of the award in the Wood case) plus an additional amount to settle the punitive damage claims.

In the Armstrong case, Owens–Corning Fiberglas paid $304,166.33, which Owens–Illinois acknowledges represents $60,833 to settle the punitive damage claim and $243,333.33 (one-third of $730,000) to settle the compensatory damage claim. In the Wood case, Owens–Corning Fiberglas paid $410,625, which Owens–Illinois acknowledges represents $82,125 to settle the punitive damage claim and $328,500 (one-half of $657,000) to settle the compensatory damage claim.

At the conclusion of the case, the trial judge reduced the amount of each compensatory damage verdict by the amount that Owens–Corning Fiberglas paid to settle the compensatory damage award. Again, in each case, that amount equalled Owens–Corning Fiberglas' *pro rata* share of the award. Owens–Illinois contends that the judge should have reduced the amount of each compensatory damage verdict by the full amount of compensation paid by Owens–Corning Fiberglas, including the punitive damage settlement amount.

 The Maryland version of the Uniform Contribution Among Tortfeasors Act, Maryland Code (1957, 1991 Repl.Vol.), Article 50, § 19 (hereinafter UCATA) provides that:

"A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides; *but reduces the claim against the other tort-*

*feasors in the amount of the consideration paid for the release,* or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid." (Emphasis added). Section 19 of the UCATA specifically provides that the amount of consideration paid in excess of a *pro rata* share shall reduce the total claim. The purpose of the Act is to prevent double recovery. The amount recoverable from the non-settling defendant when added to the amount recoverable from the settling defendant cannot exceed the plaintiff's verdict. *See Martinez v. Lopez,* 300 Md. 91, 476 A.2d 197 (1984). The Court of Special Appeals in *Exxon Corp. v. Yarema,* 69 Md.App. 124, 138, 516 A.2d 990, 997 (1986), addressed the scope of § 19 and held that "the Uniform Contribution Among Tortfeasors Act does not apply to punitive damages." We adopt the rationale of that opinion.

We first note that, although Owens–Illinois and Owens–Corning Fiberglas are joint tortfeasors with regard to the compensatory damage claims, they are not joint tortfeasors with regard to punitive damage claims. In contending that each damage award should have been reduced by the entire settlement amount, Owens–Illinois fails to recognize this distinction. Examining the purposes of the UCATA in light of the inherently different functions that punitive and compensatory damages serve, it is apparent that the Act does not envision a reduction of a nonsettling tortfeasor's liability by another's settlement of punitive damages.

The UCATA is derived, with the omission of certain sections not here relevant, from the statute promulgated by the Commissioners on Uniform State Laws in 1939 (the 1939 Model Act). *Martinez,* 300 Md. at 97, 476 A.2d at 200. As noted by the Court of Special Appeals in *Exxon,* the Commissioners' Prefatory Note to the 1939 Model Act provides in part:

"It is apparent that an injury resulting from the joint tort of two or more persons involves each of them, jointly and severally, in liability for the entire damage. It is equally apparent that this is an instance of a common obligation

resting on two or more, the discharge of which by one of them accrues to the advantage of the others."

69 Md.App. at 136, 516 A.2d at 996. We agree with the Court of Special Appeals' conclusion in *Exxon* that "the drafters intended section 19 to deal with the common liability of two or more joint tortfeasors and not with the unique liability of an individual wrongdoer." *Exxon*, 69 Md.App. at 136, 516 A.2d at 996. Thus, the Act envisions joint tortfeasors sharing the responsibility for compensating an injured party for the harm that he or she suffered or prospectively will suffer. This, obviously, is the purpose of compensatory damages. *See Restatement of Torts (Second)*, § 903 (1979).

In contrast, the award of punitive damages is not an attempt to compensate the injured party for harm suffered, but rather is, as the name implies, punitive in nature. This Court explained in *Embrey v. Holly*, 293 Md. 128, 442 A.2d 966 (1982), punitive damages " '. . . are awarded, over and above full compensation, to punish the wrongdoer, to teach him not to repeat his wrongful conduct and to deter others from engaging in the same conduct.' " *Id.* at 141, 442 A.2d at 973 (quoting *Wedeman v. City Chevrolet Co.*, 278 Md. 524, 531, 366 A.2d 7, 12 (1976)). The Court went on to explain that punitive damages "in order to be fair and effective, must relate to the degree of culpability exhibited by a particular defendant and that party's ability to pay. Punitive damages, in essence, represent a civil fine, and as such, should be imposed on an individual basis." *Id.* [293 Md.] at 141–42, 442 A.2d at 973. The Court in *Embrey* recognized that punitive damages could be awarded in different amounts against each defendant or that they could be awarded against one defendant and not another, depending on evidence presented as to the degree of culpability, the existence or nonexistence of malice, and the financial worth of each defendant. *Id.* at 142–43, 442 A.2d at 973–74. Because a compensatory award is a joint and several liability against all the joint tortfeasors while a punitive damage award is an individual liability, the settlement of a punitive

damage claim by one tortfeasor will not reduce the compensatory or punitive damage award against the nonsettling tortfeasors.

Armstrong and Wood contend, and we agree, that the UCATA does not entitle Owens–Illinois to benefit from the fact that the jury found Owens–Corning Fiberglas liable for punitive damages and that Owens–Corning Fiberglas made a payment to avoid that liability. The settlement here at issue contained two distinct liabilities and reflected settlement of both liabilities separately. Owens–Illinois argues that allowing a plaintiff to apportion his or her settlement between compensatory and punitive damages invites abuse.

In the instant case, to settle the compensatory damage claims, Owens–Corning Fiberglas paid to each plaintiff its full *pro rata* share of the compensatory damages assessed by the jury. There was no "abuse," chicanery, or collusion. Instead, Owens–Corning Fiberglas was clearly attempting, in good faith, to separately settle its compensatory damage liability and its punitive damage liability.

Consequently, we affirm the Court of Special Appeals' judgment that the trial court did not err when it reduced Owens–Illinois' liability only by the amount of the compensatory settlement.

## PUNITIVE DAMAGES

The jury award of punitive damages in the instant case must be reversed. In *Owens–Illinois v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992), we stated "the 'clear and convincing' standard of proof for punitive damages in tort cases applies to the instant cases [and] to the two cases heard by us the same day...." One of the two cases heard the same day as *Zenobia*, to which that opinion refers, is the instant case. Consequently, for the reasons stated in *Zenobia*, we shall reverse the awards of punitive damages and remand the cases for new trials on the issue of punitive damages. The plaintiffs will be required to prove their

entitlement to punitive damages by clear and convincing evidence based on the standards set forth in *Zenobia*.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR NEW TRIALS LIMITED TO THE ISSUE OF PUNITIVE DAMAGES. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID TWO-THIRDS BY PETITIONERS AND ONE-THIRD BY RESPONDENTS.