985 F.2d 553
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Dr. Emma Winifred SEWELL t/u/o Maryland CAsualty Insurance
Company, Plaintiffs-Appellants,
v.
WRAP-ON COMPANY, INCORPORATED, Defendant-Appellee.
 No. 92-1720.
 United States Court of Appeals,
Fourth Circuit.
 Argued: November 30, 1992
Decided: January 29, 1993
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. William M. Nickerson, District Judge. (CA-90-2829-WN)
 Paul R. Bartolacci, COZEN & O'CONNOR, Philadelphia, Pennsylvania, for Appellant.
 Daniel Karp, ALLEN, JOHNSON, ALEXANDER & KARP, Baltimore, Maryland, for Appellee.
 Richard L. Flax, MASON, KETTERMAN & MORGAN, Baltimore, Maryland, for Appellant.
 Valeria I. Shealer, ALLEN, JOHNSON, ALEXANDER & KARP, Baltimore, Maryland, for Appellee.
 D.Md.
 AFFIRMED.
 Before WIDENER, PHILLIPS, and HAMILTON, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 Dr. Emma Sewell (Sewell) appeals the summary judgment granted by the United States District Court for the District of Maryland in favor of the defendant-appellee, Wrap-On Company, Inc. (Wrap-On). Sewell's claims against Wrap-On stemmed from a fire in her home, inflicting over $300,000 in damages, which Sewell claimed resulted from a defect in soil heating cables (heating cables) manufactured by Wrap-On.
 
 
 2
 The district court dismissed all of Sewell's claims, including: (1) negligent failure to warn; (2) strict liability for inadequate warnings; (3) strict liability for selling a defective product; (4) breach of an express warranty; (5) breach of the implied warranty of fitness for a particular purpose; and (6) breach of the implied warranty of merchantability. The district court dismissed the first two claims because Sewell failed to produce sufficient evidence that the alleged inadequate warnings caused the fire and the latter four claims primarily because Sewell failed to produce sufficient evidence to establish a defect in the heating cables.
 
 
 3
 Although we disagree with the district court with respect to the causation issue, we nonetheless affirm the dismissal of the failure to warn claims ((1) & (2)) on the basis that Sewell did not adequately establish that Wrap-On knew or should have known that its heating cables might ignite nearby combustible materials. We also affirm the dismissal of the latter four claims because Sewell did not adequately establish a defect in the heating cables.
 
 
 4
 * Wrap-On manufactures, among other things, "Gro-Quick" electric heating cables, which assist in germination and seedling growth during the winter months by supplying constant bottom soil heat to seedling containers. Sewell has used heating cables since 1965. She purchased her first Wrap-On heating cable at the end of the 1987 growing season (spring) and another such cable in February 1988, before beginning that year's seedling germination.
 
 
 5
 Sewell's basic arrangement for growing plants remained unchanged from 1965 until a fire destroyed her home on April 11, 1988. She germinated the seedlings in her "greenhouse," a room which is part of the main structure of her house. On the west wall of the greenhouse, Sewell placed seven "flats" on counters, four to the right of a sink and three to the left.[1] Sewell used one heating cable to service the four flats to the right of the sink and the other heating cable to service the three flats to the left. Sewell plugged the heating cable to the right of the sink directly into an electrical outlet, but used an extension cord to connect the cable to the left of the sink to the same outlet. Sewell did not use a thermostat to gauge the temperature of the heating cables in any of the flats. Joint Appendix (J.A.) at 124.
 
 
 6
 To allow each heating cable to service multiple flats, on each side of the sink Sewell placed the flats side by side, about three-fourths of an inch apart. She then ran each heating cable from one flat over the edge and into the next flat. Within each flat, Sewell first placed approximately one inch of soil. She then laid the heating cable on top of this soil. To keep the heating cable in position, Sewell placed pebbles, gravel and metal brads (staples) around the heating cable in each flat. Sewell then laid approximately another inch of soil over the heating cable and set plastic trays on top of this soil. These plastic trays did not touch the heating cable. Inside the trays, Sewell placed plastic Jiffy Strips (individual seedling containers) containing soil and the seedlings.
 
 
 7
 Sewell used the heating cables continuously during the germination period, which lasted from January to April or May of each year. To promote seedling growth during this period, Sewell watered the individual Jiffy seedling containers, but not the soil in the flats. After the germination period, Sewell moved the plastic trays to the east wall of the greenhouse and unplugged the heating cables. However, Sewell left the flat and cable arrangement in place during the off season.
 
 
 8
 Sewell purchased the new Wrap-On heating cables because in May 1987 her existing heating cables charred the plastic trays, causing a small fire. Sewell quenched the fire herself and did not notify either the fire department or her insurance company.[2] Before installing the new Wrap-On heating cables, Sewell read the accompanying installation instructions. These instructions advised the purchaser to:
 
 
 9
 1)Fill the flat with adequate depth of soil (normally about four inches);
 
 
 10
 2)Use vinyl tape or insulated electrical staples to hold the heating cable in place;
 
 
 11
 3)Place [the heating cable] in parallel loops about three to four inches apart and three to six inches from the edge of the [flat];
 
 
 12
 4)Avoid overlapping the heating cable under any circumstances; and
 
 
 13
 5)Never slice the heating cable loop to shorten or lengthen it, as that would cause an immediate malfunction.
 
 
 14
 J.A. at 256. In addition, the illustration accompanying the instructions showed only one flat per heating cable. Id. The instructions also described the heating cables as "safe" and"low heat intensity." However, the instructions contained no warning to keep the heating cables away from combustible materials, or that improper installation might cause fires.
 
 
 15
 After purchasing the Wrap-On heating cables, Sewell read the accompanying instructions, installed the heating cables in her traditional set up and, in February 1988, began using the two Wrap-On heating cables to germinate the seedlings. On the night of April 11, 1988, Sewell awoke and escaped her house without harm when her smoke alarm detected a fire. While the fire was still burning, Assistant Fire Marshal Patrick Ryan (Ryan) arrived at the scene to investigate the possible cause of the fire. This investigation focused on "determin[ing] where the fire occurred." J.A. at 133.
 
 
 16
 By examining the most extensive areas of burn damage and various burn patterns, Ryan concluded that the fire originated in the greenhouse. J.A. at 133. Within the greenhouse, Ryan concluded that the fire originated in an area to the right of the sink on the west wall of the greenhouse. J.A. at 140. Ryan extracted "quite a mass" of "strands of wiring which appeared to have been housed with insulation" from this area of the greenhouse. These wires presumably came from the remains of the heating cables. Ryan intended to examine these wires with greater scrutiny but lost them before doing so. J.A. at 141. Ryan determined that the fire scene contained no conclusive evidence of any electrical failure causing the fire. J.A. at 154.
 
 
 17
 In his report completed after his investigation, Ryan wrote:"This fire appeared to have resulted from the referenced heating coil conveying heat to combustible materials causing a prolonged overheat." J.A. at 234. Ryan concluded in his report that the fire stemmed from "heating equipment in greenhouse ignit[ing] combustible [materials]." J.A. at 233. Ryan explained the basis for his conclusion as follows:
 
 
 18
 After identifying the point of origin which has been described, the next step o[f] investigation would be to determine a fire load. I felt as though I had identified an ignition point, or rather, an ignition source because in short, there was simply nothing there to have caused the fire. I was satisfied that the fire had occurred at that bench in the corner, that this wiring that I referred to was associated with that fire ... because [there] was nothing else there to have provided any ignition source. And again, the next step at that point was to identify what could have burned to cause unopen burning or complete this process of heating and in this case, there was some molten material on the floor and attached or adhered to the wooden structural members of the bench.
 
 
 19
 J.A. at 227.
 
 
 20
 After the fire, David J. Malberg (Malberg), an investigator for Sewell's home insurance company, investigated the fire scene in an attempt to determine the cause of the fire. During his inspection of the fire scene, Malberg noticed that "[s]everal portions of the heat cable were heavily burned in certain spots onto these trays and the trays were also burned where the heating cables were burned, as if the cable overheated in certain spots and started burning and ignited these trays!" J.A. at 237. After his inspection, Malberg concluded that "the cause of the fire is related to the apparent overheating of one of the heat cables. No other cause for this fire was found in this area of origin." J.A. at 239. Malberg added that the overheating apparently originated within the heating cable, as opposed to from the external heat emanating from the fire. J.A. at 230. However, Malberg specifically noted that he could not determine "what actually caused the overheating in the cable." J.A. at 232.
 
 
 21
 Sewell also hired Charles C. Crim (Crim), a metallurgical expert, to investigate potential causes for the fire. Crim inspected the fire scene and debris found there, uncovering some wiring remaining from the heating cables. Crim noted that this wiring had partially melted and concluded that such melting could only result from some internal surge of electricity, possibly caused by a short circuit or arcing. J.A. at 249. Crim explained that the degree of heat required to melt such wiring could only come from a surge of electricity running through the wiring, rather than a normal fire. Crim added that this melted wiring "may have acted as a source of ignition...." Id. However, Crim specifically noted that he could not conclude whether the short circuit occurred before or after the fire, J.A. at 250, and offered no opinion as to whether a defect in the heating cable or some external source caused the short circuit. J.A. at 178.
 
 
 22
 Finally, Sewell deposed John Gust (Gust), the Director of Engineering for Wrap-On, primarily to determine whether Wrap-On knew before the fire that its heating cables might ignite combustible items placed near the heating cables. Sewell sought to establish this knowledge by questioning Gust about another Wrap-On product, electric heating tapes, and the reasons why, before Sewell's fire, Wrap-On began adding warnings to the heating tapes' instructions that improper installation might cause fires. Sewell also inquired why, in 1987, Wrap-On began considering changes to the instructions for the heating cables.
 
 
 23
 Gust stated that Wrap-On manufactured two heat resistant products: heating tapes, which wrap around pipes and use heat generated by electricity to keep the pipes from freezing, and heating cables. When in use, the heating tapes often come into contact with flammable items such as insulation. Gust indicated that Wrap-On began revising the instructions for the heating tapes in 1984, primarily because the Consumer Products Safety Commission (CPSC) informed Wrap-On that the heating tapes could cause fires. J.A. at 263. These new instructions included warnings that improper installation of the heating tapes might cause fires. J.A. at 265. Gust added that the CPSC never issued any similar warnings for the heating cables. J.A. at 263.
 
 
 24
 Gust also stated that Wrap-On began considering changes to the instructions for the heating cables in 1987. J.A. at 262. Gust indicated that Wrap-On initiated such action because "it was just a natural flow since we had adopted that strategy with the heat tapes to continue it into this and other products of an electric nature." J.A. at 264.[3] This action culminated in Wrap-On issuing new heating cable instructions after Sewell's fire in 1988. These new instructions warned that improper installation of the heating cables might cause fires. In addition, the new instructions warned that "[t]his equipment is not intended for use in conjunction with any plastic containers whether rigid or foam in nature." J.A. at 267, 288. Sewell asked Gust to clarify the reason for these new warnings, leading to the following discourse:
 
 
 25
 Counsel:What was the reason for adding on to the instruction sheet a warning about the potential risks involved in using the [heating tapes]?
 
 
 26
 Gust:Well, essentially this was a result of a conversation that I had with the officers in 1984. I had advised them that we had a note from the CPSC saying or requesting a reason why we didn't warn about fire and one of the officers said to me 'can heat[ing] tape[s] start a fire,' and I said 'I have not seen one' and I said 'on the other hand, I cannot tell you that it cannot start a fire,' so, therefore the decision was made.
 
 
 27
 Counsel:That was with regard to the heat[ing] tape[s], right?
 
 
 28
 Gust:That is with regard to any resistance electrical product.
 
 
 29
 Counsel:Why did you wait from 1984 to 1988 to make the change on the soil heating cable instructions?
 
 
 30
 Gust:We knew of no problem then and we know of no problem now.
 
 
 31
 Counsel:Why do you warn now of the risk of fire if you know of no problem now?
 
 
 32
 Gust:Primarily due to the concept of failure to warn in the legal profession.
 
 
 33
 J.A. at 265-66. Gust added that the evidence from the Sewell fire, i.e., the heating cables and the plastic trays melting together, induced Wrap-On to include the specific warning against using the heating cables in conjunction with plastic containers. J.A. at 268. Gust also noted that no other factor contributed to the decision to add the warning against using the heating cables with plastic containers. Id.
 
 
 34
 Armed with the testimony from Ryan, Malberg, Crim and Gust, Sewell filed suit against Wrap-On on October 31, 1990. Sewell alleged six claims, including: (1) negligent failure to warn; (2) strict liability for inadequate warnings; (3) strict liability for selling a defective product; (4) breach of an express warranty; (5) breach of the implied warranty of fitness for a particular purpose; and (6) breach of the implied warranty of merchantability.
 
 
 35
 Wrap-On then moved for summary judgment against Sewell on all of her claims. The district court granted Wrap-On's motion, dismissing all of Sewell's claims. With respect to failure to warn claims, ((1) and (2)), the district court reasoned that Sewell produced no evidence "indicating that her 'improper' installation of the soil heating cables caused the fire," or that "additional warnings would have prevented the fire." J.A. at 332. With respect to the remaining claims, the district court reasoned that "Sewell presented no evidence of a specific product defect." J.A. at 334. Specifically, the district court opined that Sewell "offered no testimony as to why the heating cables ignited combustible (plastic and wood)," and that Sewell presented no evidence "that any short circuit was the result of a defect in the cables rather than the result of some other cause." J.A. at 334, 335 (emphasis in original).
 
 II
 
 36
 In her appeal, Sewell first argues that the district court improperly awarded summary judgment against her, dismissing her two failure to warn claims.[4] Specifically, Sewell contends that she presented sufficient evidence to create material issues of fact on each element of her failure to warn claims. In analyzing Sewell's argument, we must first review the appropriate standard for granting summary judgment, and then, applying this standard, determine whether Sewell produced sufficient evidence to establish each element of a failure to warn claim under Maryland law.
 
 
 37
 * A district court shall award summary judgment if the evidence before the court, consisting of the pleadings, depositions, answers to interrogatories and admissions of record, establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Rule 56 mandates the entry of summary judgment against a party who, after reasonable time for discovery and upon motion, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial [and][t]he moving party is 'entitled to judgment as a matter of law.' " Id. at 323 (citations omitted).
 
 
 38
 If the evidence favoring the non-moving party is"merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). In addition, inferences to be drawn from the nonmoving party's evidentiary facts must be "reasonable in light of the competing inferences...." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). Unsupported speculation is insufficient to defeat a motion for summary judgment. Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (citation omitted). Moreover, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact. Anderson, 477 U.S. at 247-48. Thus, only disputes over those facts that might affect the outcome of the case under the governing law are considered to be"material." Id.
 
 B
 
 39
 Under Maryland law, to establish a failure to warn claim against a seller, a plaintiff must show that:
 
 
 40
 (1) the seller knew or had reason to know that the chattel was likely to be dangerous for the use for which it was supplied;
 
 
 41
 (2) the seller had reason to believe that those for whose use the chattel was supplied would not realize its dangerous condition; and
 
 
 42
 (3) the seller failed to exercise reasonable care to inform them of the dangerous condition.
 
 
 43
 Dechello v. Johnson Enterprises, 536 A.2d 1203, 1207 (Md. App. 1988) (quoting Restatement (Second) of Torts § 388). In addition, the plaintiff must establish two distinct elements of causation: (1) that "the contingency or condition that should have been warned against was the actual cause of the accident and injuries," 63 Am. Jur. 2d Products Liability § 358 (1964); see also, Owens-Illinois, Inc. v. Armstrong, 604 A.2d 47, 52-53 (Md. App. 1992), and (2) that had the defendant warned the plaintiff, the plaintiff would"have altered his behavior so as to avoid injury." M. Stuart Madden, Products Liability § 10.7 at 404 (2d ed. 1988). See also, Owens-Illinois, 604 A.2d at 5152.
 
 
 44
 In the present case, Sewell alleged that Wrap-On failed to provide six specific warnings for its heating cables. These omitted warnings included that: (1) she should have used separate thermostats for each heating cable; (2) she should have kept the heating cables away from plastic or other flammable items; (3) she should have used one heating cable to heat only one flat; (4) she should have attached the heating cable to hardware cloth; (5) she should have avoided placing the heating cables against wood; and (6) she should have covered the heating cables with three inches of soil. Sewell contends that had Wrap-On included these warnings in the heating cable instructions, the fire would not have occurred.
 
 
 45
 The district court dismissed Sewell's failure to warn claims against Wrap-On, reasoning that Sewell did not produce any evidence establishing that Wrap-On's failure to warn caused the fire. Specifically, the district court opined "Sewell has offered no evidence indicating that her improper installation of the [heating cables] caused the fire, e.g., that the lack of separate thermostats or the presence of plastic Jiffy trays, or the lack of any hardware cloth in any way caused the fire." J.A. at 332. Although we agree with the district court that Sewell presented no evidence that the first, third, fourth, fifth and sixth alleged inadequacies in Wrap-On's instructions caused the fire, we think Sewell's evidence did create a material issue of fact as to whether the second alleged inadequacy-that Sewell should have kept the heating cables away from combustible materials-caused the fire.
 
 
 46
 Traditionally, the causation element of any tort claim requires proof that "the defendant's conduct ... was a material element and a substantial factor in bringing [a certain event] about." W. Page Keeton et al., Prosser and Keeton on the Law of Tortss 41 at 267 (5th ed. 1984). See also, Eagle-Picher v. Balbos, 604 A.2d 445, 463 (Md. 1992); Owens-Illinois, 604 A.2d at 52-53. If the plaintiff establishes that the defendant's conduct substantially contributed to the plaintiff's injury, "it follows that [the defendant] will not be absolved from liability merely because other causes contributed to the plaintiff's injury." Prosser § 41 at 267.
 
 
 47
 A plaintiff may satisfy her burden of proof on the element of causation by producing evidence providing "a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant [substantially contributed to the plaintiff's injury]." Id. at 269. However, when the plaintiff's evidence equally supports two or more possible causes for her injury, one of which the defendant is responsible for and the other of which it is not, the plaintiff has not met her burden of proof. Id. (citing Altrichter v. Shell Oil Co., 161 F. Supp. 46, 49 (D. Minn. 1955); Lane v. Hampton, 87 S.E.2d 803, 806 (Va. 1955)). See also, Krause v. Sud Aviation Societe Nationale de Construction Aeronautiques, 413 F.2d 428, 432 n.4 (2d Cir. 1969); Reder v. Hanson, 338 F.2d 244, 247 (8th Cir. 1964). In such circumstances, courts reason that the fact finder could only speculate as to the cause of the plaintiff's injury.
 
 
 48
 In the present case, these principles required Sewell to produce evidence showing that at least one of the conditions which she claims Wrap-On should have warned against substantially contributed to the fire. In addition, to have probative value this same evidence cannot equally support an alternative inference that some other factor for which Wrap-On was not responsible substantially contributed to the fire.
 
 
 49
 We think that the statements elicited from Ryan and Malberg satisfied this burden. In his report, Ryan stated that"the fire appeared to have resulted from the referenced heating coil conveying heat to combustible materials causing a prolonged overheat." J.A. at 234. In addition, Malberg concluded that "[s]everal portions of the heating cable were heavily burned in certain spots onto these trays and the trays were also burned where the heating cables were burned, as if the cable overheated in certain spots and started burning and ignited these trays!" J.A. at 237. These statements suggest that the close proximity of the heating cables to combustible plastic substantially contributed to the fire. In addition, such evidence does not equally support an inference that some other factor substantially contributed to the fire. Thus, we think Sewell produced sufficient evidence to establish that Wrap-On's failure to warn against placing combustible materials near the heating cables caused the fire.
 
 C
 
 50
 Although we disagree with the district court on the causation issue, we may nonetheless affirm the dismissal of Sewell's failure to warn claims on different grounds if fully supported by the record. Stern v. Merrill Lynch, Pierce, Fenner & Smith, 603 F.2d 1073, 1093 (4th Cir. 1979) (citing Eltra Corp. v. Ringer, 579 F.2d 294, 298 (4th Cir. 1978)). Accordingly, we think that Sewell produced insufficient evidence to establish the first element of her failure to warn claim, i.e., that Wrap-On "knew or had reason to know that the[heating cables were] likely to be dangerous for the use for which [they were] supplied." Dechello, 536 A.2d at 1207.[5]
 
 
 51
 Sewell relies on three evidentiary facts to establish such knowledge by Wrap-On: (1) the fact that Wrap-On knew as early as 1984, from CPSC reports, that its heating tapes could ignite nearby combustible objects; (2) the fact that Wrap-On began considering changes to its heating cable instructions in 1987, before Sewell's fire in 1988; and (3) the fact that Wrap-On's heating cable instructions issued after the fire specifically warned against using the heating cables in conjunction with plastic containers. However, we think that none of these facts create a reasonable inference that Wrap-On knew, before Sewell's fire in 1988, that its heating cables might ignite combustible objects placed in close proximity to the heating cables. We shall discuss our conclusions with respect to each evidentiary fact separately.
 
 
 52
 Sewell first contends that a fact finder might reasonably infer the requisite knowledge by Wrap-On from the fact that Wrap-On knew, as early as 1984, that its heating tapes exhibited a tendency to ignite nearby combustible materials. Sewell reasons that heating tapes and heating cables comprise part of Wrap-On's "resistance heating" product line, and that, therefore, knowledge of the heating tapes' propensities creates a reasonable inference that Wrap-On had similar knowledge about its heating cables. To support this argument, Sewell cites to Bastian v. TPI Corp., 603 F. Supp. 474 (N.D. Ill. 1987).
 
 
 53
 In Bastian, the plaintiff sought to establish that a manufacturer knew that its baseboard heater had a tendency to cause fires by introducing evidence of "substantially similar" prior occurrences with other baseboard heaters manufactured by the defendant. The manufacturer argued that such evidence did not indicate the requisite knowledge in that the prior incidents were not "sufficiently similar because they involved heaters with different model numbers." Id. at 477. The court rejected this argument, reasoning that the plaintiff had alleged that the heaters involved in the prior incidents contained the same design as the heater in the present case and that any differences among these heaters were primarily cosmetic. Id.
 
 
 54
 In the present case, however, Sewell made no allegations and presented no evidence indicating any similarity in the designs of the heating cables and the heating tapes. In addition, at oral argument WrapOn emphasized that, when in use, its heating tapes often touch combustible items such as insulation. In contrast, the heating cables usually remain surrounded by non-combustible soil when in use. In light of Sewell's failure to produce any evidence illustrating similarities in the designs of the two products and the substantially different environment in which the two products are used, we conclude that WrapOn's knowledge that its heating tapes might ignite nearby combustible materials should not equate to similar knowledge about the heating cables. The mere fact that these two products comprised part of the same product line does not alter our conclusion.
 
 
 55
 Sewell next contends that a fact finder could reasonably infer the requisite knowledge by Wrap-On from the fact that Wrap-On began considering changes to the heating cable instructions in 1987, before Sewell's fire. We disagree. Sewell offered no evidence suggesting why Wrap-On began considering changes to these instructions before the fire in 1988. The only evidence on this issue is Gust's uncontradicted statement that Wrap-On considered changing the heating cable instructions because it had already changed the instructions for "other products of an electrical nature." J.A. at 264. In addition, Sewell produced no evidence that, before Sewell's fire in 1988, Wrap-On specifically considered adding warnings that users should avoid placing combustible materials near the heating cables. In summary, we conclude that the mere fact that a manufacturer begins considering general revisions to a product's instructions does not, by itself, suggest that the manufacturer knew of a specific product danger. Haysom v. Coleman Lantern Co., 573 P.2d 785, 791 (Wa. 1978) ("A subsequent change in instructions may be implemented to improve a product for reasons other than to cure a serious defect.").
 
 
 56
 Sewell's third and final evidentiary fact also fails to establish the requisite knowledge by Wrap-On. Sewell's last evidentiary fact relates to the heating cable instructions issued after Sewell's fire, which contain a specific warning to avoid using the heating cables with plastic containers. However, Gust's uncontradicted testimony indicates that Wrap-On issued this specific warning because of the evidence obtained from Sewell's fire. Thus, Sewell has simply failed to present any correlation or nexus between the new instructions and Wrap-On's knowledge before her fire in 1988. In the absence of such a nexus, we adhere to the time-honored principle that warnings added after an accident do not indicate knowledge of a specific danger before the accident. Hagan v. Washington Suburban Sanitary Com'n., 314 A.2d 699, 703 (Md. App. 1974) (evidence of subsequent remedial measures cannot "fill the evidentiary void of[defendant's] knowledge of the existence of a latent danger prior to the accident."). See also, Grenada Stell Industries, Inc. v. Alabama Oxygen Co., Inc., 695 F.2d 883, 888 (5th Cir. 1983); Werner v. Upjohn Co., 628 F.2d 848, 857 (4th Cir. 1980), cert. denied, 449 U.S. 1080 (1981); Morris v. Wilson, 539 A.2d 1151, 1156 (Md. App. 1988).
 
 
 57
 In conclusion, we hold that the district court erroneously determined that Sewell failed to produce sufficient evidence to establish that Wrap-On's failure to warn against placing combustible materials near the heating cables caused the fire. However, we nonetheless affirm the dismissal of Sewell's failure to warn claims on the basis that Sewell's evidence provides no reasonable inference that WrapOn knew or should have known, before Sewell's fire, that its heating cables might ignite nearby combustible materials.
 
 III
 
 58
 Sewell also contends that the district court improperly awarded summary judgment against her remaining claims, which included: (1) strict liability for selling a defective product; (2) breach of an express warranty; (3) breach of the implied warranty of fitness for a particular purpose; and (4) breach of the implied warranty of merchantability. Specifically, Sewell objects to the district court's conclusion that "Sewell presented no evidence of a specific product defect." J.A. at 332. The district court relied on this conclusion to dismiss all four of Sewell's remaining claims.
 
 
 59
 Sewell offers two arguments to support her contention that she produced sufficient evidence to establish a product defect. First, Sewell claims that Maryland law does not require her to prove a specific defect in the heating cables. Rather, Sewell contends that she needed only prove that "the product malfunctioned, that it was given only normal or anticipated use prior to the accident and that there are no reasonable, secondary causes which were responsible for the accident." Brief of Appellant at 18 (citing Breidor v. Sears Roebuck & Co., 722 F.2d 1134, 1140-41 (3d Cir. 1983)). Sewell contends that her evidence satisfied this test. Second, Sewell claims that Crim's conclusions that the heating cables short circuited, coupled with the lack of evidence indicating potential causes for the short circuit other than a product defect, satisfied her burden of proof.
 
 
 60
 We disagree with both of Sewell's arguments. Under Maryland law, a plaintiff cannot merely rely on the occurrence of an accident to establish a product defect. Rather, the evidence must show "that it is more probable than not that the defect existed at the time of sale." Virgil v. "Kash n' Karry" Serv. Corp., 484 A.2d 652, 657 (Md. App. 1984). The plaintiff can satisfy this burden in an accident "where circumstantial evidence tends to eliminate other causes." Id. However, if such evidence equally supports two conflicting inferences, the plaintiff failed to establish a defect. Prossers 41 at 269.
 
 
 61
 In the present case, Sewell's evidence indicates that the heating cables overheated and that such overheating probably resulted from a short circuit causing an internal surge of electricity. However, none of Sewell's evidence suggests that the short circuit more probably resulted from a defect in the heating cables than from some other external cause. Specifically, none of Sewell's experts reached any conclusions as to what caused the short circuit in the heating cables. Malberg conceded "what actually caused the overheating in the cable [i.e. the short circuit], I don't know," J.A. at 232; while Crim acknowledged that he could not conclude whether a defect in the heating cable or some external source caused the short circuit. J.A. at 178. In addition, Ryan's testimony did not even mention a short circuit in the cables, much less any potential causes for it. Thus, Sewell's theory for establishing a product defect rests on the mere occurrence of an accident and not on any plausible explanation for what caused the short circuit. In short, because Sewell's expert testimony equally supports inferences that either a product defect or some external source caused the heating cables to short circuit, her remaining claims cannot be sustained.[6]
 
 
 62
 We, therefore, affirm the district court's award of summary judgment dismissing Sewell's claims for (1) strict liability for selling a defective product; (2) breach of an express warranty; (3) breach of the implied warranty of fitness for a particular purpose and (4) breach of the implied warranty of merchantability.
 
 IV
 
 63
 For the reasons stated herein, we affirm the district court's award of summary judgment, dismissing all of Sewell's claims against Wrap-On.
 
 AFFIRMED
 
 
 [1]
 The parties define "flats" as shallow wooden boxes, having dimensions of 20" X 12" X 3", with open slats in the bottom. These flats contained the soil heating cables and the seedlings
 
 
 [2]
 Sewell could not remember who manufactured the old heating cables
 
 
 [3]
 Notably, the record contains no evidence indicating what specific instructions or warnings Wrap-On considered adding to the heating cable instructions before Sewell's fire in 1988
 
 
 [4]
 Maryland recognizes that "[t]he standard for liability under strict liability and negligence [in failure to warn cases] is essentially the same." Weinberger v. Bristol-Myers Co., 652 F. Supp. 187, 192 (D. Md. 1986). Thus, these two claims will be addressed together
 
 
 [5]
 Notably, Maryland law requires a plaintiff to show that the seller knew or should have known of a product danger to establish a failure to warn claim in either negligence or strict liability. Owens-Illinois v. Zenobia, 601 A.2d 633, 641 (Md. 1992)
 
 
 [6]
 Notably, Sewell's evidence fails even under her own standard, because her evidence did not tend to eliminate "reasonable, secondary causes" for the short circuit. Brief of Appellant at 18. In addition, we think it is wholly irrelevant that there is no evidence suggesting other possible causes for the short circuit. It was Sewell's burden to prove that a defect in the cables more prob 6350 35 7 ably caused the short circuit than some other factor